# ORIGINAL IN THE DISTRICT COURT FOR THE STATE OF DELAWARE

LEROY COLEY  
    Petitioner

    V.

STATE OF DELAWARE  
    Respondent

Cr. A. No. 9804018111

No. 11, 2005

0 6 - 8 5



FILED  
FEB - 7 2006

U.S. DISTRICT COURT  
DISTRICT OF DELAWARE

## MEMORANDUM OF LAW IN SUPPORT OF 2254

NOW COMES, Leroy Coley, Pro Se, submits a MEMORANDUM OF LAW IN SUPPORT OF 2254. The memorandum of law is as follows:

### NATURE AND STAGE OF THE PROCEEDINGS

Appellant, Defendant below, Leroy Coley, was indicted on one count of IMPROPER LANE CHANGE in violation of Title 21, Section 4122 of the Delaware Code of 1974, as amended; one count of TRAFFICKING IN COCAINE in violation of Title 16, Section 4753(a)(2)(a) of the Delaware Code of 1974, as amended; one count of POSSESSION WITH INTENT TO DELIVER A NARCOTIC SCHEDULE II CONTROLLED SUBSTANCE in violation of Title 16, Section 4751 of the Delaware Code of 1974, as amended; one count of MAINTAINING A VEHICLE FOR KEEPING CONTROLLED SUBSTANCES in violation of Title 16, Section 4755(a) of the Delaware Code of 1974, as amended; one count of TAMPERING WITH PHYSICAL EVIDENCE in violation of Title 11, Section 1269 of the Delaware Code of 1974, as amended.

A jury trial began October 18, 2004, and concluded on October 19, 2004. Before trial, the State agreed to enter a nolo prosequi on Count II of the indictment - TRAFFICKING IN COCAINE. At the

close of the State's case, Appellant, Defendant below, moved the lower court for a judgment of acquittal. The lower court granted the request as to Count V of the indictment - TAMPERING WITH PHYSICAL EVIDENCE and denied the request as to the remaining counts.

The jury returned verdicts of "GUILTY" as to count I, Count III, and Count IV. On December 16, 2004, Appellant, Defendant, was sentenced as follows:

IK98-05-0288: $5,000.00 fine (suspended); 8 years Level V suspended after 2 years, followed by 6 months Level IV Halfway House, followed by 18 months Level III.

IK98-05-0291: $50.00 fine.

On the Defendant's direct appeal to the Supreme Court of Delaware, the case was remanded for reconsideration. The Court affirmed the decision.

## VIOLATION OF SPEEDY TRIAL/IADA

The State violated IADA laws. The state of Delaware had 180 days to bring the defendant to trail and the State did not comply.

The Defendant sent two certified letters, which are part of court records, asking for disposition in 2001-2002. (see Motion to Dismiss transcripts - 3/15/04, Dkt. Entry 40 A-1) (See Barker v. Wingo 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d. 101 "IADA more efficacious than a speedy trial claim, once a demand is made prosecution must be brought within 180 days"; Schofs v. Warden FCI Lexington 509 F.Supp. 784 (1981) "Although terms of Interstate Agreement on Detainers had not been literally met, letters written by a federal prisoner, who was denied the necessary forms through

2

no fault of his own, to clerk and state's attorney requesting a final disposition of charges against him satisfied requirements of IAD; purposes of IADA's are to protect prisoner against whom detainers are outstanding, to encourage expeditious and orderly disposition of outstanding charges, to determine proper status of detainers, and to establish cooperative procedures for attainment of those goals and the IAD should be construed liberally to effectuate those purposes. See also Cuyler v. Adams--U.S. 101 S.Ct. 703, 66 L.Ed.2d. 641 (1981) IADA, 2 Art. IX, 18 U.S.C.A. App.; C.G.S.A. 54-186 et seq.; IADA, 2 Art. V(c), 18 U.S.C.A. App.") State v. Roberts, 427 S.2d. 787 (Fla. Dist. Ct. App. 2d Dist. 1983) ("many courts have held that to invoke protections of Act, a prisoner only substantially comply with the requirements of the act."); State v. Angelone, 67 Wash. App. 555, 837 P.2d. 656 (Div. 2 1992) ("once a prisoner informs officials it becomes their duty to provide the proper forms and to process the papers "properly.") The state of Delaware received a letter on July 21, 2003 along with a letter from the paralegal's office |A-1| (Docket entry 28) The defendant did not get to Delaware until JAN.13,04;case Review FEB.10,04 [A-1 |. The defendant did not get to trial until October 18, 2004. |A-2| See American Bar Ass., Standards for Crim. Justice Standard 12-3.1. ("recommended that the obligation to bring about a speedy trial should fall on the prosecutor, regardless of demand.") See Esx v. Michigan, 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d. 406 (1993) ("the issuing state is under a constitutional duty" to make a diligent "good faith effort" to bring the defendant to trial) The instant case happened on April 23, 1998. The state knew of the defendant's whereabouts. The

3

defendant's rights have clearly been violated. See Middlebrook v. Delaware, 860 A.2d. 260; Sixth Amend. to the United States Constitution and Article I, Section 7 of the Delaware Constitution, Fourteenth Amend. Due Process clause.

According to Title 11 Del. C. § 2542 (d)(e) "any" written request asking for disposition should start the process. See Schofs v. Warden FCI Lexington, 509 F.Supp. 78 (1981); State v. Roberts, 427 S.2d. 787 (Fla. Dist. Ct. App.2d. Dist. 1983); State v. Angelone, 67 Wash. App. 555, 837 P.2d. 656 (Div. 2; 1992). The defendant has done what has been required of him, which the record would clearly reflect. The indictment should be dismissed with prejudice. Title 11 Del. C. 2542 (d).

The case at hand was prohibiting the defendant from educational and rehabilitative transfers. It also kept the defendant at a more severe security level and prohibited him from dropping security levels, which would help the defendant better prepare for society. All of this was included in the letters received by the court. (It was clearly noted that the defendant has programmed to the fullest. A- ). |see Motion to Dismiss Transcript Dkt. No. 40. Coley has not received the transcripts to refer back to| A-1.

Beebe v. State, 346 A.2d 169; Title 11 Del. C. 2542 (a) (The "only" duty of the prisoner is to ask prison officials for a disposition to start the process.) See Schofs v. Warden FCI Lexington, 509 F.Supp. 78 (1981); State v. Roberts, 427 S.2d. 787 (Fla. Dist. Ct. App.2d. Dist. 1983); State v. Angelone, 67 Wash. App. 555, 837 P.2d. 656 (Div. 2; 1992). The indictment should be dismissed with prejudice. Title 11 Del. C. 2542 (d).

4

The court breached an Agreement imposed by the court.  |The President Judge Ridgely|.  The Breach of Agreement voided defendant's waiver of a speedy trial.

Once the defendant arrived in Delaware, Defendant was supposed to be brought to trial by January **17**, 2004.  |Not to mention when the court received the letters from the defendant asking for disposition in 2001-2002|.  At a hearing conducted by the then President Judge Ridgely, the court and the defendant agreed to waive his Speedy Trial on the condition the court wait for his co-defendant who was in Iraq fighting the war.  The co-defendant was to be back in April of 2005.  As you can see, his testimony would have held great weight.  The court and the defendant agreed he could exonerate the defendant.  |Note:  The defendant has not received the Motion to Dismiss Transcripts to refer back to.|  See Stinner v. Stinner, 446 A.2d. 651 (P.A. 1982) ("Oral stipulations made in open court and receiving imprimatur of judge are binding upon individual rights of party inter se and have same effect as though reduced to writing and executed formally").  |President Judge Ridgely was sworn in as a Supreme Court Judge, so the Honorable Witham resided over the remainder of the proceedings.|

When the court forced the defendant into trial on October 18, 2004, against the defendant's objections, it was a breach of an Agreement.  A-3.  The Breach of Agreement would void the defendant's waiver.  The void in the waiver would mean prosecution should have had the defendant in trial by January **17**, 2004.  A-1 Dkt. Entry 28.  This would put the court in violation of the defendant's Constitutional Rights:  Sixth Amend. Right to a Fair and Speedy Trial, United States Constitution; Article I, Section 7

5

of the Delaware Constitution; Fourteenth Amend. Due Process
Clause. See Middlebrook v. State of Delaware, 820 A.2d. 268.

The court insists the defendant was supposed to be in trial
by March 2004. A-1 Dkt. Entry 31. The defendant asked for a
disposition in 2001-2002. The court received a letter to the
paralegal office on July 2003. A-1 Dkt. Entry 28. Either way,
the defendant's constitutional rights were seriously violated.
(See Note).

Due to the State's unnecessary trial delay, Officer Berna
"could not recall" many facts, which surely prejudiced the
defendant.

## "PRETEXTUAL" STOP/ILLEGAL SEARCH AND SEIZURE

The lower court erred in finding Berna had probable cause to
stop the motor vehicle driven by Coley since, under the
circumstances, Berna was not justified in pulling over a vehicle
for an unsafe lane change within seconds of making a pass of the
suspect's vehicle en route to another police complaint |A-4|,
deciding the subjects looked nervous |A-5|, aborting the pass in
order to get behind and follow the "nervous" suspects with the
intent to pull the vehicle over due to their nervousness [A-10].
The police must have a legitimate and objective reason for
stopping an individual for a traffic violation. See generally
Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769. United
States v. Dortch, 5th Cir. 199 F.3d. 199, 199 (1999) (finding no

Note:   The defendant has not received his Motion to Dismiss
Transcripts.

reasonable suspicion of drug activity based on nervousness and conflicting answers). Officer Berna stated that someone's mental state is best left up to experts |A-8|. Officer Berna was not deemed as an expert witness |A-9|. Officer Berna testified that he pulled the vehicle over for the unsafe lane change "with the hopes of checking out what the 'nervousness' was about." |A-10|. In light of the facts the stop, which appears to be "pretextual," was not justified despite the fact that an alleged traffic violation occurred. In fact, the best evidence that Coley committed a traffic violation (i.e. failure to use a signal) was never presented to a judge or magistrate until the officer testified at suppression |A-11|. In Berna's own words, he intended to pull the vehicle over at the point he decided to follow the vehicle, and not at the point a traffic violation occurred. The stop and inquiry was not reasonably related in scope to the justification for their initiation. The officer's conduct was not reasonably related to the traffic stop. The officer exceeded the proper scope of a traffic stop, and the initial stop was not justified. There was no reason to believe the defendant committed, was committing, or was about to commit a crime, so any detention of the defendant was unlawful. (See Hicks v. State, Del. Supr. 631 A.2d. 6, 10 (1993)).

The stop for the unsafe lane change was clearly a "pretextual" stop. The police officer admitted, not only at the suppression hearing, but at trial, that it was his intention to follow the vehicle and wait for the defendant to commit a traffic violation so he could pull the defendant over and investigate - [A-6,7] , Within seconds Defendant was stopped for an unsafe lane

7

change.   See also Whitehead, 698 A.2d. 1120 N.4 (Citing David A.
Harris, Whren v. U.S.: Pretextual Traffic Stops, The Champion,
March 1997 at #41).   Police need more than "mere hunch" or
"unparticularized suspicion".   This is clearly an intrusion into
the privacy of the defendant.   See Com. of Penn v. Huff, 833 A.2d.
227; U.S.C.A. Const. Amend. 4; Del. C. Ann. Const. Art. 1 § 6;
U.S. v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d.
621 (1981); Robertson v. State, 596 A.2d. 1345, 1350 (Del. 1991).
1.    Coley argues that the traffic stop was unreasonable because
the officer subjectively intended to use the stop as a pretext to
investigate Coley's activities rather than enforce traffic laws.
See e.g., State v. Ladson, 138 Wash. 2d. 343, 979 P.2d. 833, 837
(1999) ("Article I, Section 7 |of the Washington State
Constitution|, forbids use of pretext as a justification for a
warrantless search or seizure because our Constitution requires
|that| we look beyond the formal justification for the stop to the
actual one.   In the case of pretext, the actual reason for the
stop is inherently unreasonable, otherwise the use of "pretext"
would be unnecessary."); see also State v. Sullivan, Ark. Supr.;
S.W. 3d. 551, 553 (2000) ("We draw a clear distinction between
arresting a person with crack cocaine in his hands, as was with
Whren, and effecting a pretextual arrest for the purpose of a
search."); State v. Jurnado, Minn. Supr. 582 N.W. 2d. 886, 892
(1998) ("For an intrusion not based on probable cause, the pretext
factor is relevant to determining whether the intrusion is
reasonable.")

    The right of individuals to be free from unlawful searches
and seizures is secured in state by both guarantee of an

individual's right under the Fourth Amendment of the United States Constitution to be "secure in their persons, houses, papers, and effects against unreasonable searches and seizures" and the nearly identical language of the State Constitution (U.S.C.A. Const. Amend. 4; Del. C. Ann. Const. Art. 1 § 6).   The officer could only state that he noticed occupants looked nervous and moving around in the car, but the officer did not observe any particular behavior by the occupants of the car.   In recent decisions of the court it has been decided that in the totality of the circumstances, that is not reasonable for a police officer to believe a crime had been committed, or is about to be committed, simply because occupants in a vehicle made vague movements or looked nervous while sitting in the automobile.   Under the laws of Delaware, more is required.   See Delaware v. Moore, 2001 WL 1198682 (Del. Supr.); Del. C. Ann. Const. Art. 1 § 6.

2.   See United States v. Dortch, 5th Circ. 199 F.3d. 193, 199 (1999) ("Finding no reasonable suspicion of drug activity based on nervousness and conflicting answers.")   The Delaware Constitution may independently "afford the citizens of this State greater protection against unreasonable searches and seizures than may be required by the Supreme Court's interpretation of the Fourth Amendment..."   The greater protection available under the State Constitution is required here.

Although a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our courts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in the "often competitive enterprise of ferreting out crime."   See

In re. D.E.M., 1999 P.A. Supr. 59, 727 A.2d. 570, 578 N.19 (P.A. Supr. 1999) (quoting Terry, 392 U.S. at 11-12, 88 S.Ct. 1868). Therefore, the fundamental inquiry of a reviewing court must be an objective one.

When Officer Berna was asked if he noticed anything when he was behind the vehicle, he said, "No." |A.12|. When the police officer was asked if his intention was waiting for the defendant to commit a traffic violation to pull the defendant over and investigate, the police officer said, "Yes." |A-6,7|.

In Curt Nail v. State of Maryland, 359 M.d. 272, 753 A.2d. 519 it is stated:

> ...Despite the fact that there are usually less people during the early morning hours, a driver is still entitled to privacy at any time of the day and should not be disturbed by the police without any constitutional authority.  By refusing to harbor the fruits of unconstitutional seizures, the Court of Appeals gives teeth to the notion that the courts cannot accord polices carte blanche to pick and choose whom to stop based on some "hunch" that a motorist, or his passengers, are involved in criminal activity. (U.S.C.A. Const. Amend. 4).

> Whether a given detention is "unreasonably attenuated" necessarily involves a fact-intensive inquiry in each case.  This standard respects the State's interest in investigating suspicious conduct during a valid traffic stop, while restricting police officers' authority to employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements.

10

(See F. Caldwell v. State, 780 A.2d. 1037).

A traffic stop should not serve as a justifying predicate for a narcotics-related investigation that followed its immediate wake. An additional detention "for the purpose of determining whether a police officer can acquire sufficient probable cause or a waiver that would permit him to search the car for illegal narcotics." (See Whitehead, 698 A.2d. 1120; see also Charity, 753 A.2d. 565). A police officer is not allowed to use the tactic of a "fishing expedition" for probable cause or consent to search. (See Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d. 347 (1996)).

The Maryland Court of Appeals summed up the problem: ...Driving is one of the most heavily regulated activities in today's society. Studies conducted between Interstate 95, between Baltimore and Delaware, 93% of all drivers commit some sort of traffic violation. In light of this, the police essentially have unlimited discretion to stop any driver, for any reason, since any driver will violate some sort of trivial regulation at the very least. (See Whitehead, 698 A.2d. 1120 (citing David A. Harris, Whren v. U.S.; Pretextual Traffic Stops, The Champion, March 1997)). The police are not allowed to use a stop as a springboard for a full investigative detention or search. (See Fred Caldwell v. State of Delaware, 780 A.2d. 1037).

Officer Berna "immediately" ordered the occupants out of the car and arrested them |A-13|. The ordering of the occupants out of the car was not an incident of the traffic stop. It was for

11

the independent purpose of an investigative detention or search.
(See Charity, 753 A.2d. 567; F. Caldwell v. Delaware, 780 A.2d.
1037).

3.    Nowhere in the summons or affadavit of probable cause does it
say there was a failure to use a signal |A-11|. Nor was the
defendant ticketed for it. Yet, at suppression it was the main
topic for probable cause |A-  |. If the no-signal was "really"
the main purpose of the stop, it is evident that it would have
been mentioned in the summons, affadavit of probable cause, or the
defendant would have been ticketed for it. Of course, the
defendant was not |A-11|. As testified to by Officer Berna, the
affidavit of probable cause  is "a way" for him to present
"certain" criteria "he feels and hopes" can get him a warrant |A-
14|. The defendant was charged with unsafe lane change.  The
officer admitted he did not fear for his safety when he was behind
the defendant |A-15|. The officer stated he does not recall any
other traffic on the road |A-16|. There was only testimony of a
no-signal, not an unsafe lane change. That is what the defendant
was indicted for, and that is what is on the ticket. No signal
and unsafe lane change are two separate statutes. Mr. Coley
testified he used a signal |A-17|. Mr. Coley's testimony should
not have been wholly discredited.

4.    The stop for the unsafe lane change was clearly a
"pretextual" stop. The police officer admitted, not only at the
suppression hearing, but at trial, that it was his intention to
follow the veicle and wait for the defendant to commit a traffic
violation so he could pull the defendant over and investigate  :
[A,6,7] . Within seconds Defendant was stopped for an unsafe lane

12

change. (See also Whitehead, 698 A.2d. 1120 N.4 (citing David A.
Harris, Whren v. U.S.: Pretextual Traffic Stops, The Champion,
March 1997 at #41). Police need more than "mere hunch" or
"unparticularized suspicion". This is clearly an intrusion into
the privacy of the defendant (See Comm. of Penn v. Huff, 833 A.2d.
227; U.S.C.A. Const. Amend. 4; Del. C. Ann. Const. Art. 1 § 6;
U.S. v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d.
621 (1981); Robertson v. State, 596 A.2d. 1345, 1350 (Del. 1991)).
5.    The lower court also erred in denying the defendant's motion
to suppress since the state failed to establish a reasonable,
articulable suspicion for Berna to continue his search
investigation beyond the limited scope of the initial traffic stop
for an unsafe lane change. Officer Berna was contacted by
dispatch and responding to another call |A-4|. Officer Berna
testified that he pulled the vehicle over for the unsafe lane
change with the hopes of checking out what the nervousness was
about |A-10|. Berna stated that Coley could not produce a
driver's license  |A-19|. Officer Berna immediately took Coley
into custody by removing him from the vehicle in order to "make
certain who he was" |A-18|. Berna stated that "|Coley| probably
told me his name after I pulled him out of the car" |A-19|.
However, Berna was satisfied the driver was Coley at the time he
was issued a summons |A-20| and at no time did Berna believe that
Coley was an unlicensed driver |A-21|. The defendant's license
number was on the summons immediately following arrest |A-23|, yet
Officer Berna stated he placed Coley "immediately" under arrest
for the unsafe lane change |A-13|. The defendant was not ticketed
for not having a license, but the officer insisted the defendant

13

did not show a license |A-21,22|. U.S. 420, 439-40, 104 S.Ct. 31, 38, 82 L.Ed.2d. 317 (1984): "The officer may ask a moderate number of questions to obtain identity and unless the detainee's answers provide the officer with probable cause to arrest him, he 'must' be released." The inability to produce credentials, without more, does not justify a search of the vehicle. As held in State v. Lark, 319 N.J. Supr. 618, 627 (App. Div. 1999); aff'd. 163 N.J. 294 (2000):

> ...During a traffic stop, if a driver fails to present a
> license and then lies about his identity. The officer may
> either detain the driver for further questioning (see
> State v. Dickey, 152 N.J. 468, 476-83, 706 A.2d. 180
> (1998)), or arrest the driver for operating the vehicle
> without a license (See N.J.S.A 39: 3-29,39: 5-25; see
> also State v. Campbell, 53 N.J. 230, 237, 250 A.2d.
> (1969). The officer may not, however, absent probable
> cause to believe that a further offense has been
> committed, enter the vehicle to look for identification.

Here, of course, the driver had not offered false information regarding his identity, since the officer alleges the defendant did not offer a license |A-24|. In State of New Jersey v. Steven Carty, A-3732-98T5: "The trooper asked the driver for a license and registration and the trooper 'alleged' he did not produce either. The trooper asked the driver to step back to his vehicle so he could write down his information, his name, address, date of birth, for a check if he did have a license and to make sure the car was not stolen, which was a rental car. The officer testified at some point headquarters advised him that the driver did have a

14

valid license and the car was not stolen. The officer patted the drier and his passenger down and searched the vehicle. The officer stated he performed a pat-down for his safety because there were two suspects. The court stated the pat-down was not justified due to the fact the officer could have called for backup or placed the suspects in his vehicle since the driver signed a consent form for the search of the vehicle, which the court also stated was beyond the scope of the traffic stop. The court stated the officer should have issued a summons and sent the suspects on their way after the verification from headquarters."

More specifically, the State attempted to justify the pat-down, which took place during a routine traffic stop, by asserting that it was a reasonable measure for the arresting officer to have taken to ensure his safety. The officer had no information or otherwise to believe the suspects were armed and dangerous (See Jones, 745 A.2d. 872 (1999); quoting State v. Johnson, 7th Cir. 170 F.3d. 708, 718 (1999): "while officer safety is both legitimate and weighty, it cannot in all circumstances justify a search and seizure." See also New Jersey v. Steven Carty, A-3732-98T5: "We hold that, in the absence of articulable suspicion, the request to search to which the driver assented offended the State Constitution, and since the proposed search was the only basis for the pat-down, the pat-down was also necessarily constitutionally offensive. The exigency that he thus proffered as justifying the search was in effect of his own making. While alternative steps might well have been somewhat inconvenient for the police, the balance must come down to the protection of constitutional rights.")

15

The officer alleged he smelled marijuana, but this was excluded prior to trial for the reasons of no seeds, no marijuana, burned or otherwise |A-25|. The defendant was not charged with consumption or D.U.I. |A-26|. Basically there was no evidence to support this. The officer also testified that this did not play a factor in arresting the defendant |A-26,27|.

The lower court misconstrued, among other things, the facts by saying the defendant was "uncooperative" |A-  |. Nowhere in Officer Berna's testimony does he infer or say the defendant was "uncooperative." Officer Berna referred to a particular stretch of highway that he initiated the stop as 45 mph, which is/was 35 mph at the time of arrest. This could easily be verified by the court. (The defendant does not have the resources to obtain this information). The officer apparently has also misconstrued many facts. The officer used "certain" criteria "he feels" and "hopes" can get him a warrant |A-14|.

See Caldwell v. State, 770 A.2d. 522 (quoting Jones v. State, Del. Supr. 745 A.2d. 856 (1999): "The state incorrectly distinguished the officer's safety from the need for an articulable suspicion; officer safety, at least on this record, does not obviate the court's obligation to assess independently the legality of the officer's actions.") There was no evidence the defendant possessed a weapon and no evidence he was hostile. There was no evidence the defendant was armed and dangerous. In sum, the officer pointed to no specific and articulable facts which, taken together with a rational inference from those facts, reasonably warranted an intrusion. (See Hicks v. State, Del. Supr. 631 A.2d. 610 (1993)). It was a pretext to search for

16

drugs. The exigency Officer Berna used justifying his actions was of his own making.

Florida v. Roger, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed. 2d. 229 (1983): "Reasonable suspicion of criminal activity warrants a temporary seizure for purpose of questioning limited to the purpose of the stop."; id. at 500, 103 S.Ct. 1319: "The scope of the detention must be carefully tailored to its underlying justification...|A|n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."

Whitehead v. State, Md.App. 497, 698 A.2d. 1115, 1118 (1997): "The purpose of the traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupants constitutes a second stop, and must be independently justified by a reasonable suspicion."

Charity, 753 A.2d. 567: "Sergeant Lewis' ordering of the appellant to the rear of the car was not even in part an incident of the traffic stop. It was, in our judgment, exclusively for the independent purpose of investigating a likely narcotics violation." See Berkemer v. McCarty, 468 U.S. 420, 439-40, 104 S.Ct. 3138, 82 L.Ed.2d. 317 (1984): "The officer may ask a moderate number of questions to obtain identity and unless the detainee's answers provide the officer with probable cause to arrest him, he must be released."

17

Wrightson, 391 A.2d. at 229: Excluding evidence uncovered in consensual search during illegal detention after a traffic stop because it was an "exploitation of the illegal detention."

In Caldwell v. State, 780 A.2d. 1037: "The state responds that the officer's decision to handcuff and frisk Caldwell was supported by the officer's observations of Caldwell and the officer's safety concerns. The lower court held based on: 1. Caldwell's assertion that he did not know the name of the passenger, 2. Conflicting statements by Caldwell and the passenger, 3. The officer's inability to locate the razor blade that Caldwell allegedly placed in the center console, and 4. Caldwell's nervous behavior, the officer had probable cause. The Supreme Court of Delaware reversed."

State v. Varnado, Minn. Supr., 582 N.W. 2d. 886, 892 (1998): "For intrusions that are not based on probable cause, such as the frisk here, we have held that the pretext factor is relevant to determining whether the intrusion is reasonable."

Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d. 441 (1963) (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); See also Hicks, 631 A.2d. at 12): "The officer's persistence in relocating Hicks and re-examining his pouch was an illegal search and seizure, the result of which is that all evidence so obtained, either directly or indirectly, must be suppressed."

The facts of the case have clearly shown this was a pretextual stop. When Officer Berna was behind the defendant, he had seen no traffic infractions or otherwise |A-12|. Officer Berna testified saying his intention was to get behind the

18

defendant and wait for him to commit a traffic violation so he could pull the defendant over and investigate |A-6,7|. Then, conveniently, Officer Berna "immediately" pulled the defendant over for an alleged unsafe lane change and arrested the defendant |A-13|. Officer Berna pulled the defendant over to see what the nervousness was about |A-10|. Under Delaware law, and Constitution, more is required.

Then Officer Berna pulls the defendant out of the car and performs a pat-down without anything indicating a crime is being committed, had been committed, or was about to be committed. The officer had no information indicating the defendant was in possession of dangerous weapons, and the defendant was in no way being uncooperative according to the officer's testimony. The state failed to establish a reasonable articulable suspicion to continue his search investigation beyond the limited scope of the "alleged" initial traffic stop for an unsafe lane change. The officer was responding to another call by dispatch |A-4|. The initiation and search of the defendant was of Officer Berna's own making.

In Berna's own words, he intended to pull the vehicle over at the point he decided to follow the vehicle, and not at the point the "alleged" traffic violation occurred. The stop and inquiry was not reasonably related in scope to the justification for their initiation. The initial stop was not justified, let alone the pat-down.

The lower court erred in denying Defendant's acquittal motion on the intent to deliver, statements by the State prejudiced the defendant.

19

## STATE FAILED TO ESTABLISH THE ELEMENT OF "INTENT"

Defendant argues that the State's evidence as to intent to deliver was insufficient. It was clearly shown throughout the suppression/trial that there was no intent. More is needed than weight and packaging (see Renzi v. Delaware, 320 A.2d. 711; Cline v. Delaware, 720 A.2d. 891; Caldwell v. Delaware, 770 A.2d. 522; Redden v. State, Del. Supr. 281 A.2d. 490, 491 (1971); Furren v. State, Del. Supr. 285 A.2d. 411 (1971); Perry v. State, Del. Supr. 303 A.2d. 658 (1973); Byrd v. State, Del. Supr. 458 A.2d. 23 (1983); Husser v. State, Del. Supr. 533 A.2d. 1254, 1987 WL 4631 (1987); Morales v. State, Del. Supr. 696 A.2d. 390, 394 (1997).

Officer Berna testified that a person could smoke 4 grams in a 24-hour period. There were two other individuals in the car besides the defendant |A-28|. No scales, knives, etc. were found in the car, or on the defendant |A-29,30|. The defendant was not in what would be considered a "known drug area." In fact, the "alleged" drugs that Officer Berna pulled out of his pocket were in no bag and in one piece (4 grams). The currency was vouched for at trial and was not entered as an evidence |A-37,38|.

The defendant was prejudiced at trial when the prosecution elicited testimony from Officer Berna referring to the drugs as "a fairly large amount of drugs." |A-32|. (See Caldwell v. State, 770 A.2d. 522). This prosecution overreached and they elicited testimony that affected the jury's mind and gave the state's personal opinion. The officer was not deemed an expert witness |A-9|. The officer testified that mental state was something best left up to experts |A-8|. The state also elicited testimony from

20

the officer stating what a "drug abuser" looks like, which was objected to at trial, and the defendant appeared to be none of those things |A-31,32|. There were no curative instructions given. This is clearly prosecutorial misconduct and malicious prosecution, which have affected the defendant's rights (Fourteenth Amendment Due Process Clause, Sixth Amendment Fair and Speedy Trial and Article I Section 7 of the Delaware Constitution).

Noting the seriousness, the Court should have inquired generally as to whether any juror felt compelled to return a verdict due to time constraints. Considering trial was concluded at 5:30pm and a verdict was given at around 6:00-6:15pm (See State v. Frink, 2000 WL 1211175 (Del. Supr.)). The Court should have done more than it did considering the lead charge's seriousness, the issues on which the verdict turned, the strength of the State's case, and the verdict's relation to the time of day. The combined effect of all of the factors presented undermine the conviction.

## INEFFECTIVE ASSISTANCE OF COUNSEL

A criminal defendant is entitled to effective assistance of counsel.

Glover v. United States, 531 U.S. 198; 121 S.Ct. 696; 148 L.Ed.2d. 604 (2001) states:

A single serious error of counsel may violate the Sixth Amendment right to effective assistance. Murray v. Currier, 477 U.S. 478, 496 (1986); U.S. v. Cronic, 466 U.S. 648, 657 n.20 (1984); United States v. Elliot Diaz,

21

1997 WL 180334 (EDPA; Yohn, J.); see also Smith v.
United States, 871 F.Supp. 251 (ED. VA 1994).

Here, Counsel was constitutionally ineffective for failing to raise any and all claims that substantially affected Coley's rights. Counsel did not object to the proceeding of Defendant's trial. The defendant had to object because the defendant only agreed to waive his speedy trial on the condition that the court wait for his co-defendant |A-3|. The original judge agreed he could exonerate the defendant |The Honorable Judge Ridgely|. The co-defendant was a soldier in the Iraq war, so his testimony would have surely held great weight. The defendant was convicted on all charges presented to the jury. The defendant had addressed all issues with his counsel |A-2; Dkt. Entry 63,64,67|.

Counsel failed to object to numerous comments at sentencing. At sentencing, prosecution stated the defendant was arrested for drugs in a "few" different states and convicted of trafficking of 100 grams or more |A-33|. These statements are untrue and unfounded. The defendant feels these statements had a tremendous impact on his sentence. Counsel failed to raise the evident "pretextual" stop claim, which was surely a constitutional violation in itself (U.S.C.A. Const. Amend. 4; Del. Const. 1 § 6). The court actually raised the issue, and Counsel did not follow through |A-34|.

Defendant made many attempts to inform Counsel and ask him of his intentions |A-2; Dkt. Entry 63,64,67|. The defendant asked counsel to exhaust "any" and "all" remedies available. The defendant made attempts to appeal a decision, but all of the motions were forwarded to Counsel; so, Counsel was surely aware of

22

Defendant's intentions |A-35|. Yet, Counsel has made no attempts to file, or contact, the defendant. The only response that the defendant got was on October 19, 2005, and it stated nothing |A-36|. Counsel did not rebut the lower court's memorandum, which used everything the Supreme Court said was irrelevant and misconstrued many facts. The defendant repeatedly asked Counsel to rebut the lower court's brief.

Roe v. Flores-Ortega, 145 L.Ed.2d. 985 (2000) states:
Under the Federal Constitution Sixth Amendment of effective assistance of counsel, the complete denial of counsel during a critical stage of a judicial proceedings which includes appeals mandates a presumption of prejudice because the adversary process itself has been presumptively unreliable; moreover, the denial of the entire judicial proceeding, which a defendant has a right, demands a presumption of prejudice because no presumption of reliability can be accorded to judicial proceedings that never took place.

As long ago as Powell v. Alabama, 287 U.S. 45 (1932), the Supreme Court recognized that the Sixth Amendment right to counsel exists in order to protect the fundamental right to a fair trial. It is not enough that a lawyer is present at trial alongside the accused (Strickland v. Washington, 466 U.S. 668, 685 (1984)). The right to counsel is the right to the effective assistance of counsel. Despite these time-honored rules, Counsel in this case functioned more as "a friend of the Court" than "an advocate for the defendant." (Jones v. Barnes, 463 U.S. 745, 758 (1983); Brennan, J., dissenting). Most notably, Counsel neglected to advise, file the necessary responses, objections, etc. for the

23

defendant. None of Counsel's errors in this case can be championed as tactical decisions, but rather Counsel's unfaithful "sacrifice of |an| unarmed prisoner to gladiators." (United States v. Cronic, 466 U.S. 648, 657 (1984)). Accordingly, Counsel failed to function in any meaningful sense as the State's adversary.

## CONCLUSION

The defendant met his responsibility to invoke his speedy trial/IADA claim. The Court violated the defendant's rights. The Court did not fulfill its obligation to have the defendant brought to trial within 180 days, which the defendant thus has proven. The Court undoubtedly broke an agreement that was made by the defendant and the Court, which the defendant brought to the Court's attention.

The lower court clearly erred in finding Officer Berna had probable cause to pull Mr. Coley over. It is well established in Delaware law, and Constitution, that vague movements and nervousness is not enough. Officer Berna admitted his intention was to get behind Mr. Coley and wait for him to commit a traffic violation, so he could pull Mr. Coley over and investigate.

Officer Berna clearly did not show he had a reasonable and articulable suspicion for him to continue his investigation beyond the limited scope of the initial traffic stop for an unsafe lane change. The pat-down exceeded the scope of the initial stop and was unnecessary to effectuate the initial arrest. The officer had no additional information at the time of issuing the summons to believe Mr. Coley had in his possession any dangerous weapons, was

24

committing, had committed, or was about to commit a crime.

The prosecution elicited testimony that clearly prejudiced the defendant. The prosecutorial misconduct and malicious prosecution infringed on the integrity and reputation of the court. The State did not meet the criteria of intent.

Counsel performed below standards reasonable for effectiveness. Counsel's performance can not be viewed as tactical decisions. Counsel's ineffectiveness prejudiced the defendant greatly.

The defendant is asking for this "miscarriage of justice" to be corrected. The trail of prejudicial errors and constitutional violations have "undermined the fundamental legality, reliability, integrity, or fairness of the proceedings leading to the conviction."

The Defendant is asking it be warranted in the "interest of justice" his suppression be granted and his sentence be vacated.

In the "totality of the circumstances," it seems that not only has the officer misconstrued the facts to "undermine the integrity of the Court," but the lower court has as well. In the "totality of the circumstances," it is clear that not only was the stop itself illegal, but also the pat-down and the immediate arrest of Mr. Coley after the stop.

Wherefore, the Defendant prays The Honorable Court grant his motion.

On this 30 day of January 2005.

Leroy Coley #04\83-015
FCI Fort Dix
P.O. Box 7000
Fort Dix, NJ 08640

25

## PRO SE CERTIFICATE OF SERVICE

I, Leroy Coley , Petitioner herein, do hereby certify that an original and two copies of the foregoing filing has been furnished upon the Office of Clerk for the United States District of DELAWARE

District Court
844 N. King St. Lock Box 18
Wilmington, D.E. 19801-3570

And a true and correct copy has been furnished upon the Office of the ~~United~~ States Attorney for the            District of DELAWARE

John Williams, ESQ
Department of Justice
102 Water St.
Dover, D.E. 19904

I declare under penalty of perjury that the foregoing is true and correct. Executed on this day 30 of January, ~~19~~ 2005.

Leroy Coley
Leroy Coley



Ray Coley # 04183-015
Federal Correctional Institute
Box 7000
Dix, N.J. 08640

U.S. POSTAGE
PAID
FORT DIX, NJ
08640
FEB 02, 06
AMOUNT
$0.00
00081598-06

086-40

UNITED STATES
POSTAL SERVICE
9261

U.S.
X-RAY

CLERK OF THE COURT
District Court
844 N. King St.
Lock Box 18
Wilmington, D.E. 19801-3570

EXHIBITS

```
                SUPERIOR COURT CRIMINAL DOCKET           Page    3
                    ( as of  03/09/2005 )
```

State of Delaware v.  LEROY COLEY                        DOB: 11/13/1975
State's Atty: ROBERT J O'NEILL , Esq.      AKA:
Defense Atty: , Esq.

```
        Event
No.     Date         Event                        Judge
-----------------------------------------------------------------------------
        CASE REVIEW CALENDAR:  SET FOR CONTROL 07/13/99.
27     07/13/1999                        RIDGELY HENRY DUPONT
        CASE REVIEW CALENDAR CAPIAS ORDERED
28     07/21/2003
        LETTER FROM PARALEGAL OFFICE TO RON MULLIN, CHIEF STATE DETECTIVE.
        RE:ATTACHED IS CORRESPONDENCE THE COURT RECIEVED FROM THE ABOVE-
        REFERENCED DEFENDANT REGARDING A DETAINER.
29     01/05/2004
        NOTICE OF SERVICE - DISCOVERY REQUEST.
30     01/05/2004
        ENTRY OF APPEARANCE BY KEVIN M. HOWARD, ESQUIRE
31     01/13/2004                        FREUD ANDREA MAYBEE
        CAPIAS RETURNED IN SUPERIOR COURT.
        BAIL SET AT:
        CASH BAIL                     10,000.00 100%
        SECURED BAIL-RELEASED          1,025.00
        CCR: 2/24/04 AT 9:00 A.M./CASE REVIEW MOVED UP TO 2/10/04 DUE TO THE
        FACT THIS DEF. HAS TO HAVE HIS TRIAL BY 3/25/04.  ALSO SET FCR 3/10/04
        AND TRIAL 3/15.
32     02/10/2004                        VAUGHN JAMES T. JR.
        CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW 3/10, TRIAL 3/15/04.
        DATES PREVIOUSLY SET.
33     02/13/2004
        SUBPOENA(S) ISSUED.
34     02/23/2004
        NOTICE OF SERVICE - DISCOVERY RESPONSE.
35     02/27/2004
        MOTION TO SUPPRESS FILED BY KEVIN HOWARD, ESQ.
36     03/01/2004
        NOTICE OF SERVICE - DISCOVERY RESPONSE.
37     03/05/2004
        MOTION TO DISMISS FILED BY KEVIN HOWARD, ESQ.
38     03/10/2004                        RIDGELY HENRY DUPONT
        CASE REVIEW CALENDAR FINAL CASE REVIEW CONTINUED TO 03/11/04.
        ATTORNEY UNPREPARED FOR TRIAL
39     03/12/2004
        STATE'S RESPONSE FILED TO DEFENDANT'S MOTION TO DISMISS. (R. O'NEILL)
40     03/15/2004                        RIDGELY HENRY DUPONT
        MOTION TO DISMISS DENIED.  CASE CONTINUED FOR FINAL CASE REVIEW ON
        05/12/04 AND TRIAL 05/17/04.
41     04/16/2004
        SUBPOENA(S) ISSUED.
```

A-1

SUPERIOR COURT CRIMINAL DOCKET                Page    5
( as of  03/09/2005 )

tate of Delaware v.  LEROY COLEY                        DOB: 11/13/1975
tate's Atty: ROBERT J O'NEILL , Esq.        AKA:
Defense Atty: , Esq.

```
      Event
No.   Date          Event                          Judge
-------------------------------------------------------------------------------
      SUBPOENA(S) ISSUED.
55    10/13/2004                              WITHAM WILLIAM L. JR.
      FINAL CASE REVIEW:  NO PLEA/SET FOR TRIAL 10/18/04
56    10/18/2004                              WITHAM WILLIAM L. JR.
      TRIAL CALENDAR- WENT TO TRIAL JURY
57    10/18/2004                              WITHAM WILLIAM L. JR.
      MOTION TO SUPPRESS DENIED.
58    10/19/2004                              WITHAM WILLIAM L. JR.
      JURY TRIAL HELD 10/19/04. JURY FOUND THE DEFENDANT GUILTY OF ALL
      CHARGES. SUPRESSION HEARING HELD ON 10/18/04. MOTION DENIED. JUDGMENT
      OF ACQUITTAL ON ALL COUNTS WAS DENIED EXCEPT FOR IK98-05-0290 WAS
      GRANTED AND DISMISSED BY JUDGE WITHAM. S/S. SCHMIDHAUSER D/T. DONOVAN
      CR/E. SAINT-LOTH CC/B. HOLCOMB
59    10/19/2004
      CHARGE TO THE JURY FILED.
60    10/26/2004                              WITHAM WILLIAM L. JR.
      STATE'S LETTER TO JUDGE WITHAM RE: STATE WITHDRAWS IT'S REQUEST TO
      REVOKE BAIL. APPROVED.
_     12/03/2004                              WITHAM WILLIAM L. JR.
      CONTINUANCE REQUEST FILED BY THOMAS DONOVAN, ESQ.; GRANTED BY JUDGE
      WITHAM; DEFENSE ATTORNEY AT CLE; SENTENCE 12/16/04 AT 9 AM
62    12/16/2004                              WITHAM WILLIAM L. JR.
      SENTENCING CALENDAR: DEFENDANT SENTENCED.
63    12/20/2004
      DEFENDANT'S LETTER TO THOMAS DONOVAN, ESQUIRE, FILED.
      RE: RECENT SENTENCING. PLEASE SEND COPY OF APPEAL.
64    12/20/2004
      DEFENDANT'S LETTER TO THOMAS DONOVAN, ESQUIRE, FILED.
      RE: SENTENCING ISSUES,; REQUEST FOR TRIAL TRANSCRIPTS; REQUEST FOR A
      DIRECT APPEAL; AND ARGUMENTS FOR APPEAL.
65    12/27/2004
      NOLLE PROSEQUI FILED BY ATTORNEY GENERAL AS TO IK98-05-0287
66    12/27/2004
      MOTION FOR REDUCTION AND/OR MODIFICATION OF SENTENCE FILED (PRO SE).
67    12/28/2004
      DEFENDANT'S LETTER TO THOMAS DONOVAN, ESQUIRE, FILED
      RE: REQUEST CONCERNING APPEAL.
68    01/07/2005
      AGREEMENT ON DETAINERS.
69    01/12/2005
      NOTICE OF APPEAL FILED #11, 2005
70    01/12/2005
```



69

1    MS. SCHMIDHAUSER: Thank you, your Honor.

2    MR. DONOVAN: Thank you, your Honor.

3    THE COURT: But on the blunts, on the seeds,

4    that's granted.

5    MR. DONOVAN: Thank you, your Honor.

6    THE COURT: Okay. Now, with respect to the

7    proposed voir dire, although there's no objection, I have a

8    problem with No. 1. I'd recommend that you -- that we

9    simply put a period at "taken." It may be a little bit

10   confusing for some jury members to understand what is meant

11   by perpetuator.

12   MR. DONOVAN: Okay.

13   THE COURT: So, I think it does present -- what

14   you want to say simply, if we just say, "Have you or any

15   family member or close friend ever been a victim in a crime

16   or incident which involves drugs, whether or not any legal

17   action was ever taken?" period. Okay?

18   MR. DONOVAN: That's fine.

19   THE COURT: That should get after what you're

20   trying to do.

21   Okay. Is that it?

22   MS. SCHMIDHAUSER: Yes. Just so I'm sure, we're

23   just going to do jury selection this afternoon and start

70

1    openings and all the testimony tomorrow; is that correct?

2    THE COURT: Well, if we keep delaying matters

3    further, that's what's going to happen here.

4    MS. SCHMIDHAUSER: I just wanted to make sure,

5    because the officer does have an obligation at three o'clock

6    this afternoon. I want to make sure I'm right when I tell

7    him he does not need to come back until tomorrow morning.

8    THE COURT: All right. We'll take testimony

9    tomorrow, then.

10   Now, what about opening remarks today? Can we do

11   those today, or would you rather do it tomorrow?

12   MR. DONOVAN: I think, for me, I'd rather do it

13   tomorrow, but I will -- I will defer to the Court.

14   THE COURT: All right. I'll allow opening

15   remarks -- that is, opening statements to be made as well as

16   the actual case beginning tomorrow. Okay.

17   MS. SCHMIDHAUSER: At ten o'clock, your Honor?

18   THE COURT: Ten o'clock. Okay.

19   MR. DONOVAN: Your Honor, Mr. Coley does want to

20   address the Court, I believe -- and I will tell you, I don't

21   mean to hold the Court up, but Mr. Coley's reiterated that

22   he's only agreed to waive speedy trial to get Mr. Hill, his

Exhibit C

Exhibit C

Exhibit C

71

1    not necessary. I'm prepared to go forward. Mr. Coley may

2    wish to use that statement down the road, I guess, depending

3    on the outcome of the trial. But he wanted to address the

4    Court so he could be understood that he has only waived

5    speedy trial up to this point in order to get Mr. Hill here

6    to testify.

7    THE COURT: But, apparently, you're unable to get

8    Mr. Hill, despite your best efforts.

9    MR. DONOVAN: Right, we've not gotten any

10   correspondence. I've not. Mr. Coley has indicated that

11   he's gotten letters and that he's due to be back in the

12   States in March.

13   THE COURT: In March of what year?

14   MR. DONOVAN: Of next year.

15   THE COURT: Next year, all right. I mean, I'll

16   assume those facts are correct for purposes of his motion.

17   Does he still want to proceed?

18   MR. DONOVAN: Mr. Coley would like a continuance

19   until that witness could be available. But as I said, I've

20   not gotten any --

21   THE DEFENDANT: My mother is here. We have

22   correspondence with Robert Hill.

23   THE COURT: What is it that Mr. Hill would say if

72

1    he was called as a witness? What's your proffer of proof?

2    THE DEFENDANT: Well --

3    MR. DONOVAN: Essentially, just to have the story

4    told from the -- I guess from the different perspective than

5    State's witness.

6    THE COURT: Just for the story to be told?

7    MR. DONOVAN: Yeah, of the factual events. I

8    mean, at this point, I'm prepared to say that I would not

9    deem his testimony necessary. I'm not trying to sandbag my

10   client here, but as --

11   THE COURT: Is this witness expected to exonerate

12   Mr. Coley?

13   MR. DONOVAN: I don't have any -- I can't say

14   whether or not --

15   THE COURT: I need a factual basis. I find none.

16   Therefore, we're going to proceed. Thank you.

17   (Hearing concluded.)

9

1    A.       As soon as I approached the vehicle, I

2    immediately smelled burnt marijuana, that they had been

3    smoking marijuana, or somebody had been smoking marijuana in

4    the vehicle.

5    Q.       So, what did you do?

6    A.       I asked the operator for his license.

7    Q.       And could he produce a license?

8    A.       No.  He couldn't produce anything.

9    Q.       Do you see the driver of that vehicle here today?

10   A.       Yes, I do.

11   Q.       And where is he seated?

12   A.       Leroy Coley, seated right here in the white

13   prison outfit.

14   Q.       Well, since he didn't have a license, how did you

15   identify that he was Leroy Coley?

16   A.       Through an investigation.  He probably told me

17   his name after I pulled him out of car.

18   Q.       After he stepped out of the vehicle, what

19   happened next?

20   A.       I performed a quick pat-down for my safety and

21   his, make sure he had no weapons.  As I did this, an amount

22   of crack cocaine fell of his left pants.

23   Q.       How is it you believed it was crack cocaine?

10

1    A.       Just from my knowledge.

2    Q.       What do it look like?

3    A.       It was a white chunky substance.

4    Q.       And what was it in?

5    A.       I'm not sure if it was in anything.  It might

6    have been in the plastic baggy or something.  I'm not sure.

7    Q.       Okay.  After you did a pat-down, then what?

8    A.       He was placed under arrest.

9    Q.       Now, you just testified that there were other

10   occupants in the car; is that right?

11   A.       Yes.

12   Q.       How many?

13   A.       Two others.

14   Q.       And where were they seated?

15   A.       One was in the right passenger side of the car,

16   and one was in the rear.

17   Q.       And were you able to identify who they were?

18   A.       Yes.

19   Q.       And who were they?

20   A.       One was Robert Hill, and the other one was

21   subject Means, I believe.

11

1                THE COURT:  All right.

2    BY MS. SCHMIDHAUSER:

3    Q.       After the hard white substance fell to the

4    ground, what did you do with that?

5    A.       I took it into custody and kept it on my person.

6    Q.       Was the vehicle towed after that?

7    A.       Yes.

8                MS. SCHMIDHAUSER:  Your Honor, I have no further

9    questions at this time.

10               THE COURT:  All right.  Any cross-examination,

11   Mr. Donovan?

12               MR. DONOVAN:  Yes, your Honor.  Thank you.

13               THE COURT:  Thank you.

14                    CROSS-EXAMINATION

15   BY MR. DONOVAN:

16   Q.       Is it Detective Berna?

17   A.       No, Officer Berna.

18   Q.       Officer Berna, good morning.

19   A.       Good morning.

20   Q.       I'll try to make this as quick as possible.

21            You say this was about 12:20 A.M. on the 24th?

22   A.       Yes.

23   Q.       Do you recall what type of complaint you were

12

1    responding to?

2    A.       No, I don't.

3    Q.       You don't.  Did you ever make it to that call?

4    A.       At that point, no.

5    Q.       Okay.  Was it something that you say is not very

6    serious?

7    A.       I couldn't tell you.  It's been so long.

8    Q.       Now, you would agree with me, then, that the

9    complaint had nothing to do with the three subjects in a

10   black Ford Taurus; is that right?

11   A.       I agree.

12   Q.       And you actually came from behind the vehicle on

13   your way to this complaint?

14   A.       Yes.

15   Q.       And was the black Ford Taurus in the middle lane

16   on northbound 13 at that time?

17   A.       I'm not sure which lane it was actually in at

18   that point.

19   Q.       Okay.  It's fair to say that you had actually

20   passed the vehicle over -- or were going past the vehicle

21   when you noticed -- something caught your eye when you were

13

1    I was adjacent to it at one point. And, then, when they
2    slowed up, I was probably a little bit ahead of it.
3    Q.    It's fair to say there was no traffic violations
4    or whatnot before you actually got up right next to the
5    vehicle, is; that right?
6    A.    Correct.
7    Q.    And there was nothing suspicious or out of
8    ordinary as you were attempting to pass the vehicle en route
9    to 13; is that right?
10   A.    Yes, there was.
11   Q.    Why don't you tell us what it was.
12   A.    Their actions, all three of them looking at me,
13   began moving around the vehicle --
14   Q.    Right.
15   A.    -- things of nature were suspicious to me.
16   Q.    That was when you were next to the vehicle. You
17   saw -- you testified earlier this morning that something
18   caught your eye as you were passing the vehicle, they looked
19   extremely nervous.
20   A.    Yes.
21   Q.    That's the first thing that caught your eye;
22   right?
23   A.    Yes.

14

1    Q.    As you were next to the vehicle?
2    A.    Yes.
3    Q.    Okay. And, then, you slowed down; is that right?
4    A.    Yes.
5    Q.    What rate of speed were you going when the
6    nervousness caught your eye?
7    A.    I was passing him. I was adjacent to him and
8    slowly passing them. I was looking at them.
9    Q.    Did you have your emergency equipment on at that
10   point?
11   A.    No.
12   Q.    Okay. Were you -- you were in the left lane?
13   A.    Not when I passed them.
14   Q.    Where were you passing them?
15   A.    Either they were in the right lane or center
16   line -- center lane. That means I could have been in the
17   left lane or center lane when I passed him. I'm not sure.
18   Q.    You passed them on the left?
19   A.    Yes.
20   Q.    Is it uncommon for vehicles on the road to slow
21   down when a police officer is passing them?
22   A.    Not at that point, when I'm trying to position

15

1    Q.    But as you're going to a complaint, it's not
2    uncommon for a -- and you obviously aren't stopping them,
3    they're slowing down so you can pass them?
4    A.    Their brake lights never came on.
5    Q.    Okay. You do know that, if you take your foot
6    off the gas, it will slow down eventually?
7    A.    Yes.
8    Q.    And how long did it take before you could
9    actually get behind the vehicle?
10   A.    Several seconds.
11   Q.    Several seconds? And what's the speed limit on
12   that part of Route 13, do you know?
13   A.    Forty, 45.
14   Q.    And, so, after several seconds of the nervous
15   behavior and the slowing down with your vehicle, you were
16   able to get behind them; correct?
17   A.    Yes.
18   Q.    Now, I'm a little bit -- I was thrown a little
19   bit for a loop after reading your report. But you mentioned
20   that they made a lane change.
21   A.    Yes.
22   Q.    To the right lane or to the center lane?
23   A.    To the right turn lane of Townsend Boulevard.

16

1    Q.    Is that where you effected the stop?
2    A.    No.
3    Q.    And, then, what happened?
4    A.    I was going to proceed to get behind them there.
5    Then, at the last second before the turn, they switched
6    lanes back to the left lane of 13.
7    Q.    All the way back to the far left lane?
8    A.    No, to the right lane, it would be the right
9    lane.
10   Q.    And how long after that lane change did you
11   effectuate the stop?
12   A.    Say, probably a half mile.
13   Q.    Still going about 40 to 45 miles an hour?
14   A.    I don't know what the speed was at that point.
15   Q.    And you turned on your emergency equipment?
16   A.    Yes.
17   Q.    Was that -- you say you made the stop about a
18   half mile from that lane change, so you put your emergency
19   equipment on as soon as they made that lane change?
20   A.    Within a few seconds.
21   Q.    And they immediately or --

1     A.     It wasn't a minute, but I couldn't tell you the

2     exact amount of time; a substantial amount to me.

3     Q.     Okay.  Were you applying your brakes to slow down

4     to 20?

5     A.     Yes.

6     Q.     And they were, in kind, slowing down about the

7     same rate of speed; is that right?

8     A.     Yes.

9     Q.     So whatever the length of time it takes to slow

10    from 40 miles an hour to 20 miles an hour using your

11    brakes would be about the length of time that they were

12    parallel or next to you on the highway; is that fair to

13    say?

14    A.     I was only adjacent to them briefly.

15    Q.     Briefly?

16    A.     Yes.  Enough to notice their actions -- which

17    caught my eye, and that's when I perceived I better slow

18    down.

19    Q.     Okay.  And at that point you decided to abandon

20    the other call; is that right?

21    A.     For a small amount of time, yes.

22    Q.     Okay.  It was your intention at that point to get

23    behind this vehicle and follow it?

ELIZABETH A. SAINT-10TH, RPR

42

```
1        A.    Yes.

2        Q.    And your intention was to pull it over --

3        A.    Yes.

4        Q.    -- if it committed any minor traffic violations

5    so you could investigate?

6        A.    Yes.

7        Q.    How long did you follow this vehicle until it, in

8    fact, committed a traffic violation?

9        A.    It was a short distance.

10       Q.    A short distance?

11       A.    Yes.

12       Q.    Now, I'm somewhat confused.  You say that the

13   vehicle pulled over into a turn lane?

14       A.    Yes.

15       Q.    Is it an actual turn lane, or is it the right

16   lane of the highway?  I'm just --

17       A.    An actual turn lane.

18       Q.    It's an actual turn lane.  There's how many lanes

19   on that stretch of 13?

20       A.    Three, plus a turn lane.

21       Q.    Three, plus a turn lane.  And they were in the

22   far right lane?

23       A.    Yes.
```

```
 1            MS. SCHMIDHAUSER:  No further questions.

 2            THE COURT:  Mr. Donovan, any recross?

 3            MR. DONOVAN:  If I may, Your Honor.

 4            THE COURT:  You may.

 5                          RECROSS

 6    BY MR. DONOVAN:

 7       Q.   Just to clarify, the subjects in the car looked

 8    nervous but they weren't paranoid?  They didn't appear

 9    paranoid?

10       A.   They were nervous.  Paranoid is somewhat

11    different than being nervous.

12       Q.   Okay.  Is that an area of expertise that you

13    don't have, better left to the mental health officials?

14       A.   I would agree, yes.

15       Q.   Okay.  So if someone who is a user and is

16    somewhat paranoid, do you think it would be more

17    comforting for a crack user to smoke in the confines of

18    their own home or on the roads of U.S. 13 northbound?

19       A.   I would assume in their own home.

20       Q.   Okay.  He didn't appear unkempt to you, but you

21    can't remember what he was wearing; is that correct?

22       A.   Correct.

23            MR. DONOVAN:  Okay.  Nothing further.
```

1      A.    Marijuana, crack cocaine, heroin.

2      Q.    Are you familiar with what crack cocaine looks

3    like?

4      A.    Yes.

5      Q.    And in your 12 years as a police officer,

6    approximately how many drug-related arrests have you

7    made?

8      A.    I don't keep count, but I would assume in the

9    hundreds.

10     Q.    How many of those specifically involved crack

11   cocaine?

12     A.    The majority.

13          MS. SCHMIDHAUSER:  Your Honor, the State requests

14   that this witness be an expert witness -- certified as

15   an expert.

16          THE COURT:  Any voir dire by the defendant?

17          MR. DONOVAN:  Not at this time, Your Honor.

18          THE COURT:  All right.

19          MS. SCHMIDHAUSER:  Your Honor, at this point the

20   State will withdraw that request to have him certified

21   as an expert.

22          THE COURT:  All right.

23   BY MS. SCHMIDHAUSER:

45

1    Q.    Do any other vehicles that were on the road that

2    night come out, you know, in your mind now?

3    A.    No.  I was watching him.

4    Q.    Did you feel there was a potential danger of an

5    accident with an unsafe lane change?

6         MS. SCHMIDHAUSER:  Objection.

7         Your Honor, may we approach?

8         THE COURT:  All right.

9         MR. DONOVAN:  I'll withdraw the question, if

10   that's what the State wants.

11        I'll withdraw the question.

12        THE COURT:  All right.  The question is

13   withdrawn.

14   BY MR. DONOVAN:

15   Q.    So you pulled the vehicle over for an unsafe lane

16   change, correct?

17   A.    Yes.

18   Q.    With the hopes of checking out what the

19   nervousness was about?

20   A.    Yes.

21   Q.    So you placed Mr. Coley immediately under arrest

22   for the unsafe lane change, correct?

23   A.    He received a summons, correct.

17

1    stretch of highway right there, there's -- there's not a lot

2    of good places to pull a car over, so I might have waited a

3    few seconds, knowing, you know, where I wanted to pull them

4    over at.

5    Q.        Okay. And did they do anything -- I'm sorry.

6    Did they attempt to evade you at that point?

7    A.        No.

8    Q.        And was there anything improper with their

9    pulling over at that point?

10   A.        No.

11   Q.        And did you actually pull them over on the

12   highway, or did they turn off?

13   A.        They pulled off on to Jeffers Boulevard.

14   Q.        And where is that?

15   A.        That would be just north of Townsend.

16   Q.        Of Townsend, is it Boulevard or -

17   A.        Boulevard. That would be the next cross street.

18   Q.        Okay. Were there many roads -- many cars on the

19   road that evening at that time?

20   A.        I couldn't recall that. I don't know what the

21   traffic conditions were.

22   Q.        Okay. Is it fair to say that, if you can't

23   recall, there was nothing -- no other vehicles that you can

18

1    recall come to mind --

2    A.        No.

3    Q.        -- on the road?

4             And did you activate any sirens or any other horn

5    or anything with your lights?

6    A.        I wouldn't recall that.

7    Q.        You definitely recall the lights; though?

8    A.        Yes, that's how I would have them pulled over.

9    Q.        And you were pulling them over for an unsafe lane

10   change?

11   A.        Yes.

12   Q.        And that was due to the fact that they were --

13   I'm sorry, the driver was looking around inside the vehicle

14   and didn't check?

15   A.        That was due at the fact he never used a turn

16   signal. He made a one lane change into Townsend -- into the

17   right turn lane and he came back without using a turn

18   signal.

19   Q.        So, he didn't use a turn signal twice?

20   A.        Correct.

21   Q.        And you didn't charge him with failure to use a

22   signal, did you?

19

1    Q.        And is it fair to say that you didn't mention

2    anywhere in your Affidavit of Probable Cause that Mr. Coley

3    failed to use a turn signal; is that correct?

4    A.        I'm not sure if I did or not.

5    Q.        Do you want the take a look at your Affidavit of

6    Probable Cause?

7    A.        If I didn't, then I didn't, if it's not in there,

8    no.

9             MR. DONOVAN: Okay. Your Honor, if I could just

10   refresh this witness's recollection.

11            THE COURT: You may.

12   A.        That's. . .

13   Q.        I'll just ask you again, is there anything in the

14   Affidavit of Probable Cause that you submitted to the Court

15   about Mr. Coley failing to use a signal?

16   A.        No.

17   Q.        At that point, when you pulled the vehicle over,

18   were you arresting the driver for an improper lane change?

19   Was that your decision?

20   A.        Yes.

21   Q.        Okay. And did you write him a ticket?

22   A.        Yes.

23   Q.        Okay. Did Mr. Coley -- Mr. Coley was the driver

20

1    of the vehicle, to your recollection?

2    A.        Yes.

3    Q.        Did he provide you with any information? You say

4    he failed to produce a license; is that right?

5    A.        Yes.

6    Q.        Did he provide you with any information?

7    A.        I don't recall if he did or not.

8    Q.        Okay. Do you remember who owned the vehicle?

9    A.        I believe it was a leased vehicle.

10   Q.        Okay. Do you recall who the owner was?

11   A.        No.

12   Q.        Okay. Do you recall writing out a ticket to

13   Mr. Coley for unsafe lane change?

14   A.        I believe I did, yes.

15   Q.        Okay. And do you recall -- well, there's

16   information on that ticket in terms of vehicle ownership; is

17   that right?

18   A.        Yes.

19   Q.        Would it be fair to say that if it was owned by a

20   Spallco Company, it would be in that ticket?

21   A.        It could be.

22            MR. DONOVAN: Your Honor, without State's

A-11

13

1   I was adjacent to it at one point. And, then, when they

2   slowed up, I was probably a little bit ahead of it.

3   Q.      It's fair to say there was no traffic violations

4   or whatnot before you actually got up right next to the

5   vehicle, is; that right?

6   A.      Correct.

7   Q.      And there was nothing suspicious or out of

8   ordinary as you were attempting to pass the vehicle en route

9   to 13; is that right?

10  A.      Yes, there was.

11  Q.      Why don't you tell us what it was.

12  A.      Their actions, all three of them looking at me,

13  began moving around the vehicle --

14  Q.      Right.

15  A.      -- things of nature were suspicious to me.

16  Q.      That was when you were next to the vehicle. You

17  saw -- you testified earlier this morning that something

18  caught your eye as you were passing the vehicle, they looked

19  extremely nervous.

20  A.      Yes.

21  Q.      That's the first thing that caught your eye;

22  right?

23  A.      Yes.

14

1   Q.      As you were next to the vehicle?

2   A.      Yes.

3   Q.      Okay. And, then, you slowed down; is that right?

4   A.      Yes.

5   Q.      What rate of speed were you going when the

6   nervousness caught your eye?

7   A.      I was passing him. I was adjacent to him and

8   slowly passing them. I was looking at them.

9   Q.      Did you have your emergency equipment on at that

10  point?

11  A.      No.

12  Q.      Okay. Were you -- you were in the left lane?

13  A.      Not when I passed them.

14  Q.      Where were you passing them?

15  A.      Either they were in the right lane or center

16  line -- center lane. That means I could have been in the

17  left lane or center lane when I passed him. I'm not sure.

18  Q.      You passed them on the left?

19  A.      Yes.

20  Q.      Is it uncommon for vehicles on the road to slow

21  down when a police officer is passing them?

22  A.      Not at that point, when I'm trying to position

15

1   Q.      But as you're going to a complaint, it's not

2   uncommon for a -- and you obviously aren't stopping them,

3   they're slowing down so you can pass them?

4   A.      Their brake lights never came on.

5   Q.      Okay. You do know that, if you take your foot

6   off the gas, it will slow down eventually?

7   A.      Yes.

8   Q.      And how long did it take before you could

9   actually get behind the vehicle?

10  A.      Several seconds.

11  Q.      Several seconds? And what's the speed limit on

12  that part of Route 13, do you know?

13  A.      Forty, 45.

14  Q.      And, so, after several seconds of the nervous

15  behavior and the slowing down with your vehicle, you were

16  able to get behind them; correct?

17  A.      Yes.

18  Q.      Now, I'm a little bit -- I was thrown a little

19  bit for a loop after reading your report. But you mentioned

20  that they made a lane change.

21  A.      Yes.

22  Q.      To the right lane or to the center lane?

23  A.      To the right turn lane of Townsend Boulevard.

16

1   Q.      Is that where you effected the stop?

2   A.      No.

3   Q.      And, then, what happened?

4   A.      I was going to proceed to get behind them there.

5   Then, at the last second before the turn, they switched

6   lanes back to the left lane of 13.

7   Q.      All the way back to the far left lane?

8   A.      No, to the right lane, it would be the right

9   lane.

10  Q.      And how long after that lane change did you

11  effectuate the stop?

12  A.      Say, probably a half mile.

13  Q.      Still going about 40 to 45 miles an hour?

14  A.      I don't know what the speed was at that point.

15  Q.      And you turned on your emergency equipment?

16  A.      Yes.

17  Q.      Was that -- you say you made the stop about a

18  half mile from that lane change, so you put your emergency

19  equipment on as soon as they made that lane change?

20  A.      Within a few seconds.

21  Q.      And they immediately or --

1      Q.    Do any other vehicles that were on the road that

2    night come out, you know, in your mind now?

3      A.    No.   I was watching him.

4      Q.    Did you feel there was a potential danger of an

5    accident with an unsafe lane change?

6          MS. SCHMIDHAUSER:  Objection.

7          Your Honor, may we approach?

8          THE COURT:  All right.

9          MR. DONOVAN:  I'll withdraw the question, if

10   that's what the State wants.

11         I'll withdraw the question.

12         THE COURT:  All right.  The question is

13   withdrawn.

14   BY MR. DONOVAN:

15     Q.    So you pulled the vehicle over for an unsafe lane

16   change, correct?

17     A.    Yes.

18     Q.    With the hopes of checking out what the

19   nervousness was about?

20     A.    Yes.

21     Q.    So you placed Mr. Coley immediately under arrest

22   for the unsafe lane change, correct?

23     A.    He received a summons, correct.

44

```
 1      A.    Yes.

 2      Q.    Anywhere in that affidavit of probable cause did

 3   you mention that Mr. Coley failed to use his signal?

 4      A.    No.

 5      Q.    Do you recall -- okay.  It was an unsafe lane

 6   change at the time you wrote the affidavit.  The signal

 7   didn't come into effect; but who was it unsafe for, the

 8   lane change?

 9      A.    Probably both of us.

10      Q.    For both of you.  Did you fear for your safety

11   when he made that lane change?

12      A.    No.

13      Q.    Again, this is at 12:20.  Is it fair to say there

14   was no other significant traffic on the road at that

15   time?

16      A.    I couldn't recall that, but that's --

17      Q.    Fair to say?

18      A.    Not even fair to say.  Probably bars in the area,

19   things of that nature.  I couldn't really tell you.

20      Q.    Let me ask you another question.

21            Do you recall any other traffic on the road?

22      A.    I'm sure there was traffic on the road; I

23   couldn't tell you the volume.
```

17

1 stretch of highway right there, there's -- there's not a lot

2 of good places to pull a car over, so I might have waited a

3 few seconds, knowing, you know, where I wanted to pull them

4 over at.

5 Q.        Okay. And did they do anything -- I'm sorry.

6 Did they attempt to evade you at that point?

7 A.        No.

8 Q.        And was there anything improper with their

9 pulling over at that point?

10 A.        No.

11 Q.        And did you actually pull them over on the

12 highway, or did they turn off?

13 A.        They pulled off on to Jeffers Boulevard.

14 Q.        And where is that?

15 A.        That would be just north of Townsend.

16 Q.        Of Townsend, is it Boulevard or -

17 A.        Boulevard. That would be the next cross street.

18 Q.        Okay. Were there many roads -- many cars on the

19 road that evening at that time?

20 A.        I couldn't recall that. I don't know what the

21 traffic conditions were.

22 Q.        Okay. Is it fair to say that, if you can't

23 recall, there was nothing -- no other vehicles that you can

18

1 recall come to mind --

2 A.        No.

3 Q.        -- on the road?

4 Q.        And did you activate any sirens or any other horn

5 or anything with your lights?

6 A.        I wouldn't recall that.

7 Q.        You definitely recall the lights, though?

8 A.        Yes, that's how I would have them pulled over.

9 Q.        And you were pulling them over for an unsafe lane

10 change?

11 A.        Yes.

12 Q.        And that was due to the fact that they were --

13 I'm sorry, the driver was looking around inside the vehicle

14 and didn't check?

15 A.        That was due at the fact he never used a turn

16 signal. He made a one lane change into Townsend -- into the

17 right turn lane and he came back without using a turn

18 signal.

19 Q.        So, he didn't use a turn signal twice?

20 A.        Correct.

19

1 Q.        And is it fair to say that you didn't mention

2 anywhere in your Affidavit of Probable Cause that Mr. Coley

3 failed to use a turn signal; is that correct?

4 A.        I'm not sure if I did or not.

5 Q.        Do you want the take a look at your Affidavit of

6 Probable Cause?

7 A.        If I didn't, then I didn't, if it's not in there,

8 no.

9        MR. DONOVAN: Okay. Your Honor, if I could just

10 refresh this witness's recollection.

11        THE COURT: You may.

12 A.        That's. . .

13 Q.        I'll just ask you again, is there anything in the

14 Affidavit of Probable Cause that you submitted to the Court

15 about Mr. Coley failing to use a signal?

16 A.        No.

17 Q.        At that point, when you pulled the vehicle over,

18 were you arresting the driver for an improper lane change?

19 Was that your decision?

20 A.        Yes.

21 Q.        Okay. And did you write him a ticket?

22 A.        Yes.

23 Q.        Okay. Did Mr. Coley -- Mr. Coley was the driver

20

1 of the vehicle, to your recollection?

2 A.        Yes.

3 Q.        Did he provide you with any information? You say

4 he failed to produce a license; is that right?

5 A.        Yes.

6 Q.        Did he provide you with any information?

7 A.        I don't recall if he did or not.

8 Q.        Okay. Do you remember who owned the vehicle?

9 A.        I believe it was a leased vehicle.

10 Q.        Okay. Do you recall who the owner was?

11 A.        No.

12 Q.        Okay. Do you recall writing out a ticket to

13 Mr. Coley for unsafe lane change?

14 A.        I believe I did, yes.

15 Q.        Okay. And do you recall -- well, there's

16 information on that ticket in terms of vehicle ownership; is

17 that right?

18 A.        Yes.

19 Q.        Would it be fair to say that if it was owned by a

20 Spallco Company, it would be in that ticket?

33

1  ago, specifically what I did run and what I didn't. But at
2  some point, I did obtain what I needed.
3  Q.        But you arrested him when you pulled him over and
4  asked him to step out of the vehicle, is that right, before
5  you ran the computer check?
6  A.        He was receiving a summons for the unsafe lane
7  change, is that what you're implying?
8  Q.        Yes.
9  A.        Yes.
10          MR. DONOVAN: Okay, nothing further.
11          THE COURT: All right.
12          MS. SCHMIDHAUSER: Nothing further, your Honor.
13          THE COURT: You may step down, Officer.
14          (Witness excused.)
15          THE COURT: Miss Schmidhauser?
16          MS. SCHMIDHAUSER: Your Honor, State has no
17  further witnesses.
18          THE COURT: All right. Does the defense have any
19  witnesses?
20          MR. DONOVAN: Your Honor, we're going to call
21  Mr. Coley to the stand.
22          THE COURT: All right.
23          LEROY COLEY,

34

1  having been first sworn on oath, was examined and testified
2  as follows:
3          DIRECT EXAMINATION
4  BY MR. DONOVAN:
5  Q.        Mr. Coley, you've heard a lot about this incident
6  that happened about midnight on April 24 of 1998. Do you
7  recall those events?
8  A.        Yes.
9  Q.        You were driving the vehicle; correct?
10 A.        Yes.
11 Q.        At any time, did you ever fail to use your turn
12 signal when effecting a turn --
13 A.        No.
14 Q.        -- at any time during that night?
15 A.        No, I did not.
16          MR. DONOVAN: Nothing further.
17          THE COURT: All right. Any cross?
18          MS. SCHMIDHAUSER: No cross, your Honor.
19          THE COURT: Very good. All right. Mr. Coley,
20 you may step down. Thank you.
21          (Witness excused.)

35

1  maintains that it is a valid traffic stop and a valid
2  detention. Essentially, the traffic stop must be reasonably
3  related in scope to the justification of why the stop, you
4  know, even started. Here, the police officer testified that
5  he believed that the driver made an unsafe lane change;
6  that, on two occasions, he did not use his signal. The
7  people in the car were acting irrationally or suspiciously,
8  moving about the car, the fact that they slowed down
9  tremendously so the officer could not get behind them,
10 initially, and that all of those were valid reasons for the
11 driver to be given a ticket for unsafe lane change. So, the
12 stop is, in the State's view, perfectly appropriate.
13          Once the stop was made, the officer then detected
14 the smell of lingering marijuana, asked the driver,
15 Mr. Coley, for ID, which he had none. At that point, an
16 officer can clearly ask for the driver of the vehicle to
17 step out of vehicle, and it is reasonable for that officer
18 to do a pat-down for weapons, as the officer described, at
19 the waist, at the ankles, to make sure that there are no
20 weapons. At that point, this white hard substance falls out
21 of his left pant leg, just when there's a pat-down done. At
22 that point, clearly, the officer made an arrest and, as he
23 testified, there was actually an arrest being made at the

36

1  time he initially pulled the car over to issue the citation.
2          State believes that that was a valid traffic stop
3  and that there is no reason to suppress any of the drug
4  evidence that was seized.
5          THE COURT: All right. Mr. Donovan?
6          MR. DONOVAN: Your Honor, thank you.
7          What we heard today was that Officer Berna was
8  responding to another complaint, travelling northbound on US
9  13, happened to be in the same location where my client was
10 driving the vehicle. Of course, Officer Berna never made it
11 to that complaint. His testimony was that he was behind
12 this black Ford Taurus, was going around the black Ford
13 Taurus, and something caught his eye. And he saw what
14 appeared to be nervous or suspicious individuals inside this
15 vehicle.
16          Now, that is certainly a determining factor and
17 was a determining factor in Officer Berna deciding to slow
18 down and following this vehicle. However, that, under the
19 law, is not allowed. Because someone is appearing nervous,
20 not committing a criminal offense, does not give the officer
21 reasonable suspicion or probable cause to arrest. However,

1    Q.    Did you take him into custody immediately?

2    A.    Into custody as -- you mean handcuffed?

3    Q.    Well, did you take him out of the vehicle?

4    A.    I took him out of the vehicle to make certain who

5    he was.

6    Q.    Okay.  So you ordered him out of the vehicle for

7    the unsafe lane change?

8    A.    Yes.  He was in my custody at that point.

9         MR. DONOVAN:  Okay.  Your Honor, can I approach

10   the clerk?

11        THE COURT:  You may.

12        MR. DONOVAN:  Your Honor, I would like to have an

13   exhibit marked for identification.

14        THE COURT:  All right.  You may.

15        THE CLERK:  Defense for identification A has been

16   marked, Your Honor.

17        (Whereupon, Defense Exhibit A was marked for

18    identification.)

19        THE COURT:  All right.

20        MR. DONOVAN:  May I hand it to the witness?

21   BY MR. DONOVAN:

22    Q.    Officer Berna, I'll hand you what's been marked

23   Defense A for identification.  Do you recognize that

9

1   A.      As soon as I approached the vehicle, I

2   immediately smelled burnt marijuana, that they had been

3   smoking marijuana, or somebody had been smoking marijuana in

4   the vehicle.

5   Q.      So, what did you do?

6   A.      I asked the operator for his license.

7   Q.      And could he produce a license?

8   A.      No. He couldn't produce anything.

9   Q.      Do you see the driver of that vehicle here today?

10  A.      Yes, I do.

11  Q.      And where is he seated?

12  A.      Leroy Coley, seated right here in the white

13  prison outfit.

14  Q.      Well, since he didn't have a license, how did you

15  identify that he was Leroy Coley?

16  A.      Through an investigation. He probably told me

17  his name after I pulled him out of car.

18  Q.      After he stepped out of the vehicle, what

19  happened next?

20  A.      I performed a quick pat-down for my safety and

21  his, make sure he had no weapons. As I did this, an amount

22  of crack cocaine fell of his left pants.

23  Q.      How is it you believed it was crack cocaine?

10

1   A.      Just from my knowledge.

2   Q.      What do it look like?

3   A.      It was a white chunky substance.

4   Q.      And what was it in?

5   A.      I'm not sure if it was in anything. It might

6   have been in the plastic baggy or something. I'm not sure.

7   Q.      Okay. After you did a pat-down, then what?

8   A.      He was placed under arrest.

9   Q.      Now, you just testified that there were other

10  occupants in the car; is that right?

11  A.      Yes.

12  Q.      How many?

13  A.      Two others.

14  Q.      And where were they seated?

15  A.      One was in the right passenger side of the car,

16  and one was in the rear.

17  Q.      And were you able to identify who they were?

18  A.      Yes.

19  Q.      And who were they?

20  A.      One was Robert Hill, and the other one was

21  subject Means, I believe.

11

1               THE COURT: All right.

2   BY MS. SCHMIDHAUSER:

3   Q.      After the hard white substance fell to the

4   ground, what did you do with that?

5   A.      I took it into custody and kept it on my person.

6   Q.      Was the vehicle towed after that?

7   A.      Yes.

8               MS. SCHMIDHAUSER: Your Honor, I have no further

9   questions at this time.

10              THE COURT: All right. Any cross-examination,

11  Mr. Donovan?

12              MR. DONOVAN: Yes, your Honor. Thank you.

13              THE COURT: Thank you.

14                      CROSS-EXAMINATION

15  BY MR. DONOVAN:

16  Q.      Is it Detective Berna?

17  A.      No, Officer Berna.

18  Q.      Officer Berna, good morning.

19  A.      Good morning.

20  Q.      I'll try to make this as quick as possible.

21          You say this was about 12:20 A.M. on the 24th?

22  A.      Yes.

23  Q.      Do you recall what type of complaint you were

12

1   responding to?

2   A.      No, I don't.

3   Q.      You don't. Did you ever make it to that call?

4   A.      At that point, no.

5   Q.      Okay. Was it something that you say is not very

6   serious?

7   A.      I couldn't tell you. It's been so long.

8   Q.      Now, you would agree with me, then, that the

9   complaint had nothing to do with the three subjects in a

10  black Ford Taurus; is that right?

11  A.      I agree.

12  Q.      And you actually came from behind the vehicle on

13  your way to this complaint?

14  A.      Yes.

15  Q.      And was the black Ford Taurus in the middle lane

16  on northbound 13 at that time?

17  A.      I'm not sure which lane it was actually in at

18  that point.

19  Q.      Okay. It's fair to say that you had actually

20  passed the vehicle over -- or were going past the vehicle

21  when you noticed -- something caught your eye when you were

21

1    purposes of this hearing.

2    THE COURT: All right.

3    MR. DONOVAN: If I can approach, have it marked.

4    THE COURT: There's no objection?

5    MS. SCHMIDHAUSER: There's no objection,

6    your Honor.

7    THE COURT: All right.

8    THE CLERK: Defendant's Exhibit No. 1 has been

9    marked, your Honor.

10   THE COURT: Very good. Thank you.

11   (Defendant's Exhibit 1 received in evid.)

12   MR. DONOVAN: Your Honor, if I can hand this to

13   the witness.

14   THE COURT: You may.

15   BY MR. DONOVAN:

16   Q.    Do you recognize that, that exhibit that's been

17   marked --

18   A.    Yes.

19   Q.    -- Defense 1. Could you tell us what that is?

20   A.    It's a summons.

21   Q.    Yeah. Is that the ticket you wrote out to

22   Mr. Coley?

23   A.    Yes.

22

1    Q.    And the violation is for unsafe lane change?

2    A.    Yes.

3    Q.    And do you notice on there, there's a box for

4    license number, driver's license number?

5    A.    Yes.

6    Q.    Is that box filled out?

7    A.    Yes.

8    Q.    And what does it say?

9    A.    1045716

10   Q.    Is that your understanding -- is that Mr. Coley's

11   license number, as far as you know?

12   A.    As far as I know, yes.

13   Q.    Do you know where you would have got that

14   information?

15   A.    Over the air, radio, through a computer check.

16   Q.    Okay. You also have information there, owner

17   information.

18   A.    Yes.

19   Q.    Is that filled out, and who is the owner?

20   A.    Spallco.

21   Q.    Do you recall ever seeing a lease agreement, a

22   rental agreement?

23

1    that there was or wasn't.

2    Q.    Okay. You say that Mr. Coley, most likely -- you

3    can't really recall -- gave you the information of who he

4    was?

5    A.    Not in form of ID, but telling me who he was and

6    then me running a computer check.

7    MR. DONOVAN: Okay. If I could retrieve that

8    exhibit, your Honor.

9    THE COURT: You may.

10   BY MR. DONOVAN:

11   Q.    So, the information that Mr. Coley gave you, you

12   could run that check through your vehicle -- you do it over

13   radio, or --

14   A.    At that point, it would have been through our

15   dispatch, yes.

16   Q.    Okay. And were you satisfied that it was

17   Mr. Coley --

18   A.    Yes.

19   Q.    -- at that point?

20   A.    At some point in the investigation, yes.

21   Q.    Okay. At the time you made the arrest, were you

22   satisfied it was Mr. Coley?

23   A.    When I wrote the ticket, yes.

24

1    Q.    Okay. And how did you come across that

2    information? What was --

3    A.    Him telling me who he was, his date of birth, and

4    other -- his statistics that I confirmed.

5    Q.    Okay. And at no time did he produce a driver's

6    license?

7    A.    No.

8    Q.    And you did ask him for a license; right?

9    A.    Yes.

10   Q.    Did you ask him for registration?

11   A.    Yes, that would be procedure.

12   Q.    Okay. And insurance?

13   A.    Yes.

14   Q.    And was he able to produce those things?

15   A.    He -- he produced, probably, an agreement. I'm

16   not sure. I don't really recall the specifics of what he

17   produced, other than I know he didn't have any

18   identification on him.

19   Q.    But you were satisfied at that time that Mr. --

20   that the driver was a licensed driver when you wrote th

21   ticket?

22   A.    Yes.

1    Defense Exhibit 1.

2         THE CLERK:  It's been marked as Defense Exhibit

3    Number 1, Your Honor.

4         (Whereupon, Defense Exhibit 1 was marked.)

5         THE COURT:  Thank you.

6    BY MR. DONOVAN:

7    Q.    That ticket has certain information on it with

8    regard to the driver and the owner of the vehicle; is

9    that right?

10   A.    Yes.

11   Q.    Can you tell us who the owner of the vehicle is?

12   A.    Spallco Rental Cars.

13   Q.    And also, is there a driver's license number on

14   there?

15   A.    Yes.

16   Q.    Okay.  Is that the -- is that Mr. Coley's

17   driver's license number, to your understanding?

18   A.    Yes.

19   Q.    And at no time during the evening did you believe

20   that Mr. Coley was an unlicensed driver; is that fair to

21   say?

22   A.    That would be fair to say.

23   Q.    Okay.  You didn't ticket him for not having a

1    valid license in his possession; is that right?

2    A.    No, I did not.

3    Q.    You didn't ticket him for a failure to use a

4    signal; is that right?

5    A.    No.

6    Q.    And as Miss Schmidhauser pointed out, you are

7    familiar with traffic laws and you understand what they

8    are?

9    A.    Yes.

10   Q.    All right.  After you removed Mr. Coley from the

11   vehicle, you directed him to the rear of the vehicle; is

12   that right?

13   A.    Yes.

14   Q.    And you did a pat down, a weapons search?

15   A.    Yes.

16   Q.    Still under arrest for the unsafe lane change?

17   A.    Yes.

18   Q.    Okay.  Can you recall what type of clothing he

19   was wearing?

20   A.    No, I can't.  I can't recall exactly what he was

21   wearing.

22   Q.    He was wearing pants, not shorts?

23   A.    I can't recall what he was wearing exactly.

21

1  purposes of this hearing.

2  THE COURT: All right.

3  MR. DONOVAN: If I can approach, have it marked.

4  THE COURT: There's no objection?

5  MS. SCHMIDHAUSER: There's no objection,

6  your Honor.

7  THE COURT: All right.

8  THE CLERK: Defendant's Exhibit No. 1 has been

9  marked, your Honor.

10  THE COURT: Very good. Thank you.

11  (Defendant's Exhibit 1 received in evid.)

12  MR. DONOVAN: Your Honor, if I can hand this to

13  the witness.

14  THE COURT: You may.

15  BY MR. DONOVAN:

16  Q.  Do you recognize that, that exhibit that's been

17  marked --

18  A.  Yes.

19  Q.  -- Defense 1. Could you tell us what that is?

20  A.  It's a summons.

21  Q.  Yeah. Is that the ticket you wrote out to

22  Mr. Coley?

23  A.  Yes.

22

1  Q.  And the violation is for unsafe lane change?

2  A.  Yes.

3  Q.  And do you notice on there, there's a box for

4  license number, driver's license number?

5  A.  Yes.

6  Q.  Is that box filled out?

7  A.  Yes.

8  Q.  And what does it say?

9  A.  1045716

10  Q.  Is that your understanding -- is that Mr. Coley's

11  license number, as far as you know?

12  A.  As far as I know, yes.

13  Q.  Do you know where you would have got that

14  information?

15  A.  Over the air, radio, through a computer check.

16  Q.  Okay. You also have information there, owner

17  information.

18  A.  Yes.

19  Q.  Is that filled out, and who is the owner?

20  A.  Spellco.

21  Q.  Do you recall ever seeing a lease agreement, a

23

1  that there was or wasn't.

2  Q.  Okay. You say that Mr. Coley, most likely -- you

3  can't really recall -- gave you the information of who he

4  was?

5  A.  Not in form of ID, but telling me who he was and

6  then me running a computer check.

7  MR. DONOVAN: Okay. If I could retrieve that

8  exhibit, your Honor.

9  THE COURT: You may.

10  BY MR. DONOVAN:

11  Q.  So, the information that Mr. Coley gave you, you

12  could run that check through your vehicle -- you do it over

13  radio, or --

14  A.  At that point, it would have been through our

15  dispatch, yes.

16  Q.  Okay. And were you satisfied that it was

17  Mr. Coley --

18  A.  Yes.

19  Q.  -- at that point?

20  A.  At some point in the investigation, yes.

21  Q.  Okay. At the time you made the arrest, were you

22  satisfied it was Mr. Coley?

23  A.  When I wrote the ticket, yes.

24

1  Q.  Okay. And how did you come across that

2  information? What was --

3  A.  Him telling me who he was, his date of birth, and

4  other -- his statistics that I confirmed.

5  Q.  Okay. And at no time did he produce a driver's

6  license?

7  A.  No.

8  Q.  And you did ask him for a license; right?

9  A.  Yes.

10  Q.  Did you ask him for registration?

11  A.  Yes, that would be procedure.

12  Q.  Okay. And insurance?

13  A.  Yes.

14  Q.  And was he able to produce those things?

15  A.  He -- he produced, probably, an agreement. I'm

16  not sure. I don't really recall the specifics of what he

17  produced, other than I know he didn't have any

18  identification on him.

19  Q.  But you were satisfied at that time that Mr. --

20  that the driver was a licensed driver when you wrote the

21  ticket?

21

1   purposes of this hearing.

2        THE COURT:  All right.

3        MR. DONOVAN:  If I can approach, have it marked.

4        THE COURT:  There's no objection?

5        MS. SCHMIDHAUSER:  There's no objection,

6   your Honor.

7        THE COURT:  All right.

8        THE CLERK:  Defendant's Exhibit No. 1 has been

9   marked, your Honor.

10       THE COURT:  Very good.  Thank you.

11       (Defendant's Exhibit 1 received in evid.)

12       MR. DONOVAN:  Your Honor, if I can hand this to

13  the witness.

14       THE COURT:  You may.

15  BY MR. DONOVAN:

16  Q.     Do you recognize that, that exhibit that's been

17  marked --

18  A.     Yes.

19  Q.     -- Defense 1.  Could you tell us what that is?

20  A.     It's a summons.

21  Q.     Yeah.  Is that the ticket you wrote out to

22  Mr. Coley?

23  A.     Yes.

22

1   Q.     And the violation is for unsafe lane change?

2   A.     Yes.

3   Q.     And do you notice on there, there's a box for

4   license number, driver's license number?

5   A.     Yes.

6   Q.     Is that box filled out?

7   A.     Yes.

8   Q.     And what does it say?

9   A.     1045716

10  Q.     Is that your understanding -- is that Mr. Coley's

11  license number, as far as you know?

12  A.     As far as I know, yes.

13  Q.     Do you know where you would have got that

14  information?

15  A.     Over the air, radio, through a computer check.

16  Q.     Okay.  You also have information there, owner

17  information.

18  A.     Yes.

19  Q.     Is that filled out, and who is the owner?

20  A.     Spaiico.

21  Q.     Do you recall ever seeing a lease agreement, a

23

1   that there was or wasn't.

2   Q.     Okay.  You say that Mr. Coley, most likely -- you

3   can't really recall -- gave you the information of who he

4   was?

5   A.     Not in form of ID, but telling me who he was and

6   then me running a computer check.

7        MR. DONOVAN:  Okay.  If I could retrieve that

8   exhibit, your Honor.

9        THE COURT:  You may.

10  BY MR. DONOVAN:

11  Q.     So, the information that Mr. Coley gave you, you

12  could run that check through your vehicle -- you do it over

13  radio, or --

14  A.     At that point, it would have been through our

15  dispatch, yes.

16  Q.     Okay.  And were you satisfied that it was

17  Mr. Coley --

18  A.     Yes.

19  Q.     -- at that point?

20  A.     At some point in the investigation, yes.

21  Q.     Okay.  At the time you made the arrest, were you

22  satisfied it was Mr. Coley?

23  A.     When I wrote the ticket, yes.

24

1   Q.     Okay.  And how did you come across that

2   information?  What was --

3   A.     Him telling me who he was, his date of birth, and

4   other -- his statistics that I confirmed.

5   Q.     Okay.  And at no time did he produce a driver's

6   license?

7   A.     No.

8   Q.     And you did ask him for a license; right?

9   A.     Yes.

10  Q.     Did you ask him for registration?

11  A.     Yes, that would be procedure.

12  Q.     Okay.  And insurance?

13  A.     Yes.

14  Q.     And was he able to produce those things?

15  A.     He -- he produced, probably, an agreement.  I'm

16  not sure.  I don't really recall the specifics of what he

17  produced, other than I know he didn't have any

18  identification on him.

19  Q.     But you were satisfied at that time that Mr. --

20  that the driver was a licensed driver when you wrote the

21  ticket?

65

1    MR. DONOVAN: Right.

2    MS. SCHMIDHAUSER: Correct.

3    THE COURT: So, I don't know how the testimony

4    with respect to marijuana would be relevant for a

5    determination of guilt or innocence on that charge.

6    MR. DONOVAN: Well, it doesn't have anything to

7    do with that, and that's sort of my point. The marijuana

8    testimony would be at the car, the scene of the stop. The

9    testimony about the seeds which were never collected, are

10   not in evidence, which is clearly -- shouldn't be brought

11   in, testimony about it, because we don't have the thing.

12   THE COURT: Mr. Donovan, we're going to have

13   testimony. When I heard the suppression hearing, I'm

14   hearing what the officer stated about what he smelled from

15   the car, so we have eyewitness testimony from an officer who

16   stopped Mr. Coley for a -- for a traffic violation, and

17   you're telling me that we have to exclude it from the trial

18   even though we have an eyewitness?

19   Now, there's plenty of cases out there,

20   particularly in the federal courts, that have clearly said

21   courts -- have overwhelmingly found police officers' expert

22   testimony admissible where it would assist the jury in

23   understanding a particular area where they would have

66

1    particular expertise. So, if Miss Schmidhauser can qualify

2    Officer Berna having requisite expertise, officers making

3    arrests over a number of -- number of arrests, certainly

4    would have come to conclude -- they have come to conclude

5    whether something smells like marijuana or something that

6    may have some bearing in the case. And I'm not -- I can't

7    uniformly tell you that he should be excluded as a witness

8    to testify on that basis. Even courts have also -- U.S. v.

9    Brown have said that the officers can testify about their

10   drug experience. So, I'm not going to uniformly say no,

11   they can't do that.

12   MR. DONOVAN: Right. And the odor of marijuana

13   is a separate -- really is different from the other two

14   things, also. I mean, that is basically a fact type of

15   statement he'll make. But, the fact that there was no burnt

16   marijuana found inside the vehicle and it was not a factor

17   in arresting my client tends to make the testimony

18   extraneous. It's just -- there's no real reason why that

19   testimony has to come in at all. Mr. Coley's not charged

20   with any marijuana consumption or use.

21   THE COURT: Well, you're right, the officer said

22   on the stand said it was not a factor in making the arrest.

67

1    THE COURT: I agree, it's excluded.

2    MR. DONOVAN: And, your Honor, the seeds were not

3    collected.

4    THE COURT: Excluded.

5    MR. DONOVAN: And --

6    THE COURT: We don't mention the seeds.

7    MR. DONOVAN: And that separate issue back at the

8    station with the tampering of physical evidence, which

9    the -- your Honor has -- I'll try to find the case. But the

10   cocaine was collected but never tested. And State hasn't

11   submitted Officer Berna to be an expert in this case, and it

12   was just -- it's just merely a white powdery substance.

13   THE COURT: I can't recall the case you're

14   referring to, Mr. Donovan. Off the top of my head right

15   now, I can't recall it.

16   MR. DONOVAN: I can't recall either. But I can

17   -- when I go back to the office, I'll pull the file.

18   But in regards to the cocaine -- the mention of

19   cocaine is what we want to eliminate, to exclude, and

20   because it's not verifiable that it's cocaine that was

21   collected.

22   THE COURT: Miss Schmidhauser?

23   MS. SCHMIDHAUSER: Your Honor, as the indictmer

68

1    reads, it reads that "Leroy Coley, on or about the 24th day

2    of April, 1998, believing that certain physical evidence,

3    cocaine, was about to be produced and intending to prevent

4    its use, did attempt to suppress it in an act of

5    destruction. "

6    There's no doubt that that cocaine, or what the

7    State believes is cocaine, was not able to be tested. It

8    was collected. This officer is going to testify about how

9    he collected it and that, from his experience and training,

10   that he also believed that it was cocaine.

11   But the charge simply requires that somebody is

12   attempting to destroy evidence that could be used. They ar

13   tampering with physical evidence. The statute doesn't

14   require that, you know, exactly what that physical evidence

15   is that they are attempting to destroy.

16   Again, the defense is trying to sterilize this

17   case so they don't hear -- the jury is not going to hear

18   everything. We believe that it should be admissible.

19   THE COURT: All right. The statute doesn't

20   particularly -- does not indicate one way or the other

21   whether the evidence is actually what the evidence is beir

22   purported to be. So, it could very well be talcum powder,

23   . So, I'm going to deny your motion.

25

1  three feet from the vehicle?

2  A.      **As I was approaching it, somewhere around there,**

3  **yes.**

4  Q.      Okay. As you were approaching the vehicle? And

5  was it like a puff of smoke, or was it a lingering odor?

6  A.      **It was lingering odor.**

7  Q.      Like a strong odor or -

8  A.      **Strong odor.**

9  Q.      Okay. In your mind, there was marijuana being

10 smoked inside that vehicle?

11 A.      **It had at one point, yes.**

12 Q.      Okay. Did you locate any marijuana inside the

13 vehicle?

14 A.      **Just seeds, residue like that.**

15 Q.      Okay. You said also that you located some

16 blunts --

17 A.      **Yes.**

18 Q.      -- some Philly blunts. Were they used?

19 A.      **There was Philly blunts, there was tobacco, where**

20 **they had taken tobacco out of the Philly blunts and dumped**

21 **them in a bag, which is -- the wrappings for the cigars are**

22 **commonly used to smoke marijuana.**

23 Q.      Okay. You found it in those -- you found empty

26

1  blunts?

2  A.      **Yes.**

3  Q.      Did you find the tobacco?

4  A.      **The tobacco they had taken out, yes.**

5  Q.      You found that, also. Were any of those blunts

6  smoked? Did you find anything burnt inside the vehicle? is

7  what I'm asking.

8  A.      **No.**

9  Q.      You say you found seeds?

10 A.      **Yes.**

11 Q.      Were they collected?

12 A.      **That's not -- that's not common practice.**

13 Q.      You'd be surprised at some of the trials, some of

14 the other officers.

15         MS. SCHMIDHAUSER: Objection. Is there a

16 question?

17         THE COURT: I think it's a comment.

18 BY MR. DONOVAN:

19 Q.      So, at the point you asked Mr. Coley to step out

20 of vehicle, he was under arrest for the unsafe lane change?

21 A.      **Yes.**

22 Q.      Okay. You took him out of vehicle. Did you put

27

1  A.      **No.**

2  Q.      Okay. Where did you direct him to go?

3  A.      **Probably the rear of the car.**

4  Q.      Okay. Were you in front of him, behind him?

5  A.      **I was behind him.**

6  Q.      You had him stand there at the trunk?

7  A.      **Yes.**

8  Q.      Did you have him place his hands on the vehicle?

9  A.      **I don't know if I did or not. I can't recall.**

10 Q.      What's the -- you said you did a pat-down

11 search. What's the procedure to do a pat-down?

12 A.      **Just checking his waistband, pant legs, areas of**

13 **socks and shoes, make sure there's not a weapon.**

14 Q.      Did you have him place his hands on the vehicle?

15 A.      **It would depend where I'm at. I don't recall**

16 **where I had his hands at that point.**

17 Q.      You don't recall. And you say it was in this

18 pat-down search that a piece of crack cocaine fell from his

19 left pants pocket?

20 A.      **Fell from his left pants leg.**

21 Q.      Left pants leg. Did you check his pockets after

22 that?

23 A.      **At that point, yes.**

28

1  Q.      Was there anything else inside his pockets?

2  A.      **Money.**

3  Q.      Okay. Any other drugs residue or anything?

4  A.      **No, no.**

5  Q.      Did you notice if there was holes or anything

6  inside his pockets?

7  A.      **I don't recall.**

8  Q.      You don't recall?

9  A.      **No.**

10 Q.      Was he wearing a belt, do you recall?

11 A.      **I don't recall.**

12 Q.      Do you remember what kind of pants he was

13 wearing?

14 A.      **I couldn't say exactly what he was wearing.**

15 Q.      He was wearing -- you don't know if pants had a

16 button, a zipper, elastic waistband? You can't recall?

17 A.      **I can't remember exactly what kind of pants he**

18 **was wearing that long ago, no.**

19 Q.      Okay. Did you make an arrest for the consumption

20 of marijuana?

21 A.      **No.**

22 Q.      Was that basis for the arrest the smell of

23 marijuana? Did it factor in at all?

29

1   A.      It raised my suspicion even more, whether there
2   was an indicator, maybe not a factor.
3   Q.      So, it wasn't a factor in arresting Mr. Coley?
4   A.      No.
5   Q.      After the piece of crack cocaine fell from his
6   leg, left leg, that's when you did a search of the vehicle,
7   or is that when the -- is that when you did the search of
8   the vehicle?
9   A.      At some point after that, after I got everybody
10  else out of the vehicle.
11  Q.      Okay. That's when you located the seeds and the
12  blunts and other stuff?
13  A.      Yes.
14  Q.      It was after the crack cocaine fell?
15  A.      Mm-hmm.
16  Q.      Okay. And did anyone make any statements, my
17  client make any statements?
18  A.      No.
19  Q.      And, again, the -- that's . . .
20          MR. DONOVAN: I won't finish that thought. If I
21  could just have a moment.
22          THE COURT: You may.
23  BY MR. DONOVAN:

30

1   Q.      And just to clarify a point, you didn't ticket
2   Mr. Coley for not having a license; is that right?
3   A.      I think he had a valid license. I don't think I
4   gave him a ticket for not having it in his possession.
5           MR. DONOVAN: Okay, nothing further.
6           THE COURT: Any further redirect?
7           MS. SCHMIDHAUSER: Just a few questions, your
8   Honor.
9                   REDIRECT EXAMINATION
10  BY MS. SCHMIDHAUSER:
11  Q.      Officer, you testified that you weren't sure if
12  he showed you a valid registration and insurance card; is
13  that right?
14  A.      That's correct.
15  Q.      What's your normal procedure when you ask for
16  those things and they can't be produced?
17  A.      I can run a check myself, find out who the
18  registered owner of the vehicle is, if he has a valid
19  license, things of that nature.
20  Q.      Do you always issue tickets for lack of proof of
21  insurance and no registration?
22  A.      Not necessarily, no.

31

1   Probable Cause. Do you recall that?
2   A.      Yes.
3   Q.      What is an Affidavit of Probable Cause?
4   A.      Certain criteria I need to make an arrest, going
5   to the magistrate judge.
6   Q.      What type of information do you include in an
7   Affidavit of Probable Cause?
8   A.      Not all the specifics, but just what I would
9   need.
10  Q.      To what?
11  A.      Make an arrest.
12  Q.      And what are you hoping the magistrate does?
13  A.      Approve it.
14  Q.      For what?
15  A.      A warrant.
16  Q.      Okay. So, you don't put all the details of an
17  incident in your Affidavit of Probable Cause; is that right?
18  A.      That's correct.
19  Q.      You were also asked about money found on
20  Mr. Coley. Did you find money?
21  A.      Yes.
22  Q.      Where?
23  A.      It was in all pockets.

32

1   Q.      Do you recall how much money?
2   A.      It was over a thousand, 1,040 and something.
3   Q.      And do you recall what kind of denominations you
4   found the money in?
5   A.      I think there were three one-hundred-dollar
6   bills, and the rests were all small denominations.
7           MS. SCHMIDHAUSER: No further questions,
8   your Honor.
9           THE COURT: All right. Any additional questions?
10          MR. DONOVAN: Just one followup.
11                  RECROSS-EXAMINATION
12  BY MR. DONOVAN:
13  Q.      Miss Schmidhauser asked, if a driver is not able
14  to produce the registration and license and insurance card,
15  you can run a check through the system and find out whether
16  or not that stuff is valid; is that right?
17  A.      Yes.
18  Q.      What did you do in this case?
19  A.      With the registration and everything?
20  Q.      And the license.
21  A.      I'm not sure what I had and what I didn't have as

A-27

1    Q.    Okay.   And you did testify earlier that you have

2    done undercover buys, right?

3    A.    Yes, I have.

4    Q.    Purchased as much as 14 grams of crack cocaine at

5    a time?

6    A.    Yes.

7    Q.    Do you believe it would be possible for one

8    individual to consume the amount of crack cocaine that

9    was located in connection with the stop?

10    A.    I assume it would be possible; I don't know how

11    healthy it would be.

12    Q.    I don't disagree with you there.   But do you

13    think it would be possible for one person to consume

14    that amount of crack cocaine?

15    A.    I've spoken with people that have -- that use

16    crack cocaine.   I can't say that any of them probably

17    smoked that much at one time.

18    Q.    Maybe over a 24-hour period?

19    A.    That's possible.

20    Q.    You didn't have any information regarding --

21    strike that question.

22         MR. DONOVAN:   If I may just have a moment, Your

23    Honor.

54

1    A.    Yes.

2    Q.    And all 85 would bring people back to that

3    station as a common practice; is that fair to say?

4    A.    Yes.

5         MR. DONOVAN:  May I just have a moment, Your

6    Honor?

7         THE COURT:  You may.

8    Q.    Officer, you testified already about some things

9    you didn't find, such as a pipe for smoking crack

10   cocaine, right?

11   A.    Yes.

12   Q.    Did you find any scales in connection with this

13   case?

14   A.    No.

15   Q.    Okay.  Is it not uncommon for drug dealers to

16   carry scales with them when they're dealing?

17   A.    They sometimes do.

18   Q.    And it is fair to say that -- well, you did

19   testify earlier that deals are based on weight; is that

20   right?

21   A.    Yes.

22   Q.    Drug dealers will often weigh their product

23   before they place it out onto the commerce so they know

```
1    what they're selling, right?

2        A.    Yes.

3        Q.    Did you find any knives or any other instruments

4    used to break up the crack cocaine?

5        A.    No.

6        Q.    And that's -- would you agree with me -- common

7    for drug dealers, to have some kind of knife or

8    something used to break off pieces of --

9        A.    They often do, yes.

10        Q.    Did you find any glassine baggies or any other

11    type of packaging used to -- that would be used to house

12    that rock of crack cocaine?

13        A.    Yes.    The two I found in the booth.

14        Q.    You found two in the booth, right?

15        A.    Yes.

16        Q.    Did you find -- was the rock wrapped in anything?

17        A.    No.

18        Q.    It wasn't in any plastic bag?

19        A.    No.

20        Q.    Is it not uncommon to have extra clean unused

21    baggies for drug dealers to prepare and send out into

22    the stream of commerce little rocks of crack cocaine?

23        A.    It's both.    It could be common or uncommon.
```



ELIZABETH D. SAINT-LOTH, RPR

Exhibit F

1    probable cause?

2        A.    An affidavit is a list of events of certain

3    criteria that I would need to make an arrest which,

4    ultimately, a magistrate judge would sign and approve --

5    give his approval.

6        Q.    Is the affidavit of probable cause more or less

7    detailed in your police report?

8        A.    It would be less detailed in my police report.

9        Q.    Do you recall how many officers were working on

10   the night of April 24th, 1998?

11       A.    I would say probably at least ten.

12       Q.    So not all 85 were working that night?

13       A.    No.

14       Q.    You indicated that you have bought some crack

15   cocaine.

16       A.    Yes.

17       Q.    Have you ever spoken to someone who uses a lot of

18   crack cocaine?

19       A.    Yes.

20       Q.    Can you describe for me -- what do those people

21   look like and act like?

22            MR. DONOVAN:  Objection, your Honor, it's not

23   relevant to these proceedings.

1    BY MS. SCHMIDHAUSER:

2        Q.    Officer, can you describe for me the demeanor of

3    someone who you have found to be using large quantities

4    of crack cocaine?

5        A.    They seem to be very paranoid, unkempt.

6        Q.    Are they interested in eating?

7        A.    No.

8        Q.    Are they interested in sleeping?

9        A.    No.

10       Q.    Are they interested in showering?

11       A.    No.

12       Q.    By the way, would you consider four grams a large

13   quantity of crack cocaine?

14       A.    Yes.

15       Q.    When you saw Mr. Coley that night, had he

16   showered?  Did he appear unkempt to you?

17       A.    He appeared fine.  He was in good order.

18       Q.    Did he appear to you to be under the influence at

19   that time?

20       A.    No.

21       Q.    In all of your training and experience, did he

22   appear to you to be somebody who was using?

23       A.    No.

1 | corner, sell a few hundred dollars worth of drugs.
2 | Mr. Coley has been arrested in a few different
3 | states for drug charges. And the 121-month sentence
4 | that he is serving from the federal charge is
5 | because he was charged with trafficking in cocaine
6 | of over a hundred grams. Again stressing the point
7 | that he is not your small-time drug dealer.

8 | Mr. Coley was arrested almost a year later
9 | when he was out on bond. He was picked up, charged,
10 | and ultimately convicted of the trafficking in
11 | cocaine of over a hundred grams. The State believes
12 | that the fact that he was out on bail when he was
13 | still trafficking in cocaine and ultimately
14 | convicted is a tremendous aggravating factor.

15 | On the possession with intent to deliver
16 | he is facing a maximum of ten years at Level 5 with
17 | a presumptive level being at zero to 30 months. The
18 | State is requesting that the Court sentence him to
19 | 30 months at Level 5 on that charge.

20 | On the maintaining a vehicle, Mr. Coley is
21 | facing three years at Level 5. The State is
22 | recommending that all of that level time be
23 | suspended for 12 months at Level 3. Thank you.

SHEILA A. DOUGHERTY
Official Court Reporter

37

1 interest had been piqued by the actions of these individuals
2 who were otherwise abiding by all laws.
3         He slowed -- slows down to about 20 miles an
4 hour. And this was about over a period of a few seconds.
5 And the car next to him, which Mr. Coley was driving, was,
6 in turn, slowing down. And as Officer Berna characterized
7 it, it was an attempt to thwart the officer from getting
8 behind him. I think common sense tells us that, as you
9 travel down the road and a police officer is coming up
10 behind you and going to the left around you, the first
11 response of civilians is to slow down and get out of police
12 officer's way. That is certainly nothing out of the
13 ordinary, to slow down and allow an officer to get by you.
14         The discrepancy that we have with the facts as
15 presented by Officer Berna is whether or not Mr. Coley used
16 a traffic signal, because that essentially was a big part of
17 the reason why the stop was effectuated. Officer Berna
18 testified that, on two occasions, once going over to a turn
19 lane and then coming back on to the through lane on 13,
20 Mr. Coley failed to use a signal. And I would submit that
21 that evidence is lacking from the State. First and
22 foremost, Mr. Coley was never charged with failing --
23 failure to use a signal. Although they don't have to be

38

1 charged with that offense, certainly, it is notable when
2 taken in conjunction with the all the evidence that we had.
3         The second point, besides not being charged with
4 failure to use a signal, was that nowhere in the Affidavit
5 of Probable Cause was it mentioned that Mr. Coley failed to
6 use his signal. And on redirect, Officer Berna explained to
7 the Court that the purpose of the Affidavit of Probable
8 Cause is to lay out the facts necessary to establish
9 probable cause in order to get a warrant for an arrest. So,
10 it's evident that, in Officer Berna's mind and in the
11 State's view, that the failure to signal was not a necessary
12 part of this equation in establishing probable cause. And
13 it's certainly glaringly, strikingly absent from the
14 Affidavit of Probable Cause because, now, the State
15 conveniently is presenting evidence that there was a failure
16 to use a signal. You've heard testimony to the contrary
17 from the driver himself that at no time did he fail to use a
18 signal. Of course, he wasn't arrested for that, and he was
19 never charged with that.
20         So, looking at the statute, the unsafe lane
21 change which is pretty --
22         THE COURT: Wasn't he charged with unsafe lane
23 change?

39

1         MR. DONOVAN: He was charged with unsafe lane
2 change.
3         THE COURT: Okay.
4         MR. DONOVAN: And part of that, the basis of that
5 now that we hear today, not from when the Affidavit of
6 Probable Cause was filed, was the failure to signal, and I
7 would submit to the Court that the Court has heard evidence
8 to the contrary. And taking the facts, all the facts and
9 the attendant circumstances, the Court can throw out that
10 evidence because it wasn't -- it's in controversy.
11         So, the other basis or the -- the other factual
12 basis for the stop was nervousness and the looking around
13 inside the vehicle and making an unsafe lane change before
14 the way was clear. And I would submit that that's not
15 really the facts here, either. Officer Berna testified that
16 he didn't recall any other significant traffic out on the
17 highway at 12:30, which is not unusual for that strip of
18 Route 13. So, really, there was no danger. There was no
19 unsafe lane change. There wasn't a high volume of traffic
20 going up the road at this time of night. And in the few
21 seconds that he was actually following the vehicle, Officer
22 Berna testified that at no time did -- at no time did the
23 driver check to see if he could make the safe lane change

40

1 because he was too busy looking around the vehicle. That's,
2 I think, pretty weak. I think that, at that time of night
3 and with the lack of traffic going down the highway, that
4 that was purely a pretext to pull this vehicle over, which
5 had certainly caught the attention of Officer Berna when he
6 passed the vehicle.
7         The other point, or the other issue that the
8 Court's going to have to decide is at what time was this
9 arrest made. We would submit that, at the time Officer
10 Berna was next to the vehicle, looking and slowing down
11 and eyeballing the vehicle, that his presence was felt and
12 known and he was going to pull that vehicle over, regardless
13 of what was going to happen next.
14         THE COURT: So, you're saying this is a
15 pretextual stop?
16         MR. DONOVAN: Your Honor, your honor certainly
17 can find that, because I don't -- I'm not saying it was a
18 pretextual stop, but there was no probable cause to stop the
19 vehicle because there was really no unsafe lane change. And
20 that was the only basis for the stop that was presented here
21 today, was the unsafe lane change. I'm saying that the
22 State's lacking the evidence to show that there really was
23 an unsafe lane change.

30    Sep  13        Record returned from remand. (eas)

31    Oct  18        Order dated 10-18-05 by Steele, C.J., AFFIRMED.
                     (MTS,RJH,JBJ)(clh)

32    Oct  31        Document entitled "Motion for Extension of Time" by
                     Leroy Coley (no service shown) (eas).

33    Oct  31        Document entitled "Notice of Motion for
                     Reconsideration/Hearing en Banc" by Leroy Coley (no
                     service shown) (eas).

34    Oct  31        Document entitled "Petition" by Leroy Coley (no service
                     shown) (eas).

35    Nov  01        Letter dated 11/1/05 from Assistant Clerk to Thomas D.
                     Donovan, Esquire, forwarding Mr. Coley's documents
                     filed 10/31/05 for appropriate disposition (afb).

36    Nov  03        Record and mandate to clerk of court below. Case Closed
                     (afb).

37    Nov  09        Document entitled "Motion for Reconsideration Hearing
                     en Banc" by Leroy Coley. (eas)

38    Nov  10        Letter dated 11/10/05 from Senior Court Clerk to
                     appellant, advising that the Court will take no further
                     action with respect to his document has it no longer
                     has jurisdiction to address the matters raised. (eas)

39    Nov  28        Document entitled "Petition for Hearing of
                     Reconsideration Hearing on en Banc" by appellant.
                     (docket sheet sent) (eas)

A-35

## Schwartz & Schwartz
### ATTORNEYS AT LAW

**Steven Schwartz**
**Benjamin A. Schwartz**
**Thomas D. Donovan**

**1140 South State Street**
**Post Office Box 541**
**Dover, Delaware 19903**

Telephone (302) 678-8700
Facsimile (302) 678-8702

**www.DonovanDefense.com**

October 19, 2005

Leroy Coley
Fed SBI 04183-015
FCI West
P. O. Box 7000
Fort Dix, NJ 08640

Dear Mr. Coley:

Please find the enclosed order regarding your Supreme Court Appeal. This copy is for your records.

Sincerely,

Thomas D. Donovan

TDD/jfe

Enclosure

$A - 36$

1     Q.    Was it being fixed at the time?

2     A.    Yes.

3           MS. SCHMIDHAUSER:  Objection, relevancy, Your

4     Honor.  Why his car was in the shop?

5           MR. DONOVAN:  I think I'm getting to that point.

6           THE COURT:  I assume you'll make this all

7     relevant, Mr. Donovan.

8           MR. DONOVAN:  Oh, yeah.  I'm wrapping it up.

9           THE COURT:  All right.  Objection overruled.

10          You may proceed.

11    Q.    Do you remember what was wrong with the car?

12    A.    Yeah.  He had a transmission problem.

13    Q.    Okay.  Do you recall who was going to pay for the

14    repairs to that vehicle?

15    A.    I was.

16    Q.    Okay.  Had you paid for the repairs?

17    A.    Yes.

18    Q.    You did pay for the repairs.  When?

19    A.    Back in -- well, he came to me and said he needed

20    the money to get the car out the shop.  I can't recall

21    exactly what date it was, but I lent him the money to

22    take the car out the shop.

23    Q.    So you gave the money to your son?

1      A.     Right.

2      Q.     And do you recall how much money you gave to your

3   son?

4      A.     Around -- in between 11 -- 1100, $1300 I gave him

5   to fix the car, take the car out the shop.

6      Q.     And that was in April of 1998?

7      A.     Right.

8           MR. DONOVAN:  Okay.  Nothing further.

9                       CROSS EXAMINATION

10  BY MS. SCHMIDHAUSER:

11     Q.     Good afternoon, Mr. Coley.

12     A.     How are you doing, ma'am?

13     Q.     Mr. Coley, I'm a little confused.

14          You said that you paid for the repairs of the

15  car?

16     A.     For the car in the shop?

17     Q.     Correct.

18     A.     Well, I gave the money to my son, yeah.

19     Q.     Do you remember -- what was the date that you

20  gave him the money?

21     A.     Ma'am, I can't say exactly what date, ma'am.  I

22  can't really say that.

23     Q.     What month did you give him the money?